621 S.E.2d 883

**The STATE, Respondent,**

v.

**Jesse Waylon SAPP, Appellant.**

**No. 26051.**

Supreme Court of South Carolina.

Heard Sept. 21, 2005.

Decided Oct. 24, 2005.

Rehearing Denied Dec. 1, 2005.

284

Joseph L. Savitz, III, Acting Chief Attorney, South Carolina Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, and Solicitor Ralph E. Hoisington, of Charleston, for Respondent.

Justice WALLER:

Appellant, Jessie Waylon Sapp, was convicted of the murder of a South Carolina Highway Patrolman in Berkeley County and was sentenced to death.[1] We affirm.

## FACTS

At approximately 2:30 a.m., on July 7, 2002, four state highway patrolmen were conducting a driver's license checkpoint in Berkeley County. A pick-up truck with a female driver and male passenger approached the checkpoint and were stopped by Patrolman Patrick Sigwald. When Sigwald noticed alcohol containers in the back of the truck, he instructed the driver, Kathryn Boles, to pull over to the right shoulder of the road. Sigwald then approached the passenger side of the truck and asked the passenger, Sapp, for the registration and insurance certificate. Sapp opened the glove box and began looking for papers. Sigwald noticed an empty beer bottle on the front floor board and asked Sapp to hand it to him. The driver of the truck (Boles) spoke up and indicated the beer had been her first one that night. Sigwald asked Boles to step to the rear of the vehicle and she complied. At that point, Corporal Jeff Johnson, the supervisor, came up and spoke to Sigwald, asking if Boles was under age twenty-one. Patrolman Sigwald handed Corporal Johnson Sapp's driver's license. Johnson took the driver's license and approached the right-hand side of the truck, toward Sapp. Sigwald heard a loud bang, and heard Johnson say, "you sorry bastard."

---

1. Sapp was also convicted of possession with intent to distribute (PWID) Ecstasy, 3rd offense, PWID cocaine, PWID morphine sulfate, possession of Xanax, 3rd offense, and unlawfully carrying a pistol. He was given concurrent 20 year sentences on the PWID offenses, 1 year for the weapon offense, and 2 years for the Xanax offense.

Sigwald heard another gunshot, then several more, and saw Johnson firing shots at Sapp, who was running away. Sigwald opened fire and Sapp eventually fell to the ground, wounded.

Sigwald saw Johnson lying face down on the pavement. He turned Johnson over and opened his bullet-proof vest, and saw one bullet hole right below the vest. Johnson bled to death at the scene. Sapp was charged with murder, and the state sought the death penalty based upon the aggravating circumstances that Sapp had created a great risk of death to more than one person, and that he had murdered a state law enforcement officer. S.C.Code Ann. § 16–3–20(C)(a)(3) and (7)(2003). He was found guilty of murder, and sentenced to death. This appeal follows.

## ISSUES

1. Did the trial court err in excusing a potential juror for cause due to her religious beliefs concerning the death penalty?

2. Did the trial court err in sustaining the state's objection to testimony of Sapp's girlfriend as to whether she would like to see Sapp put to death?

## 1. REMOVAL OF JUROR FOR CAUSE

During *voir dire* of potential juror Kathleen McNair, the trial court explained the three types of death penalty jurors: i.e., Type 1 would always vote for death if the offense of murder were established; Type 2 would never vote for the death penalty; and Type 3 would consider the facts of the case to decide if death were appropriate. When asked which of these three types she was, McNair responded "well, as a matter of fact, I don't believe in the death penalty because of my religion." The court engaged in the following colloquy with McNair:

Q. Okay. Well, let me ask you, when you say you don't believe in it, I appreciate that and I understand that. You further stated that it's a part of your religion?

A. Yeah, that's the only thing.

Q. Okay. That's no problem. But the law of South Carolina would be and I would instruct you that the death penalty may be warranted in some cases.

A. I understand.

Q. You understand?

A. I understand that.

Q. But you're saying, as a juror you couldn't consider that law?

A. **No, I couldn't just because of my belief. That's all.**

Q. Your belief would prevent you?

A. It is my religion, that's it. But otherwise, you know, it should be—you know, it should be that way. But to me, I can't.

Q. You could never do that?

A. I can't decide on that because of my religion. I'm sorry but—

Q. I understand. As I said, there are no correct answers to any of these. It's merely how you feel.

(emphasis supplied). The solicitor then queried McNair as follows:

Q. Would it then be impossible if you sat on a jury for you to consider the death penalty based on your beliefs? And let me take it one step further. If you're sitting on a jury with the other 11 jurors and they all said the death penalty and you sort of believe, well, maybe the death penalty if it ever is appropriate might be appropriate here, could you sign your name on the death penalty verdict saying I'm calling for the death of the defendant?

A. Oh, this is hard.

Q. You're not required to.

A. I probably will. But because of my beliefs—what I'm telling you, I probably would because of the type of crime.

Q. You're saying you probably would call for the death penalty if you thought it was appropriate?

A. Yes, because of the crime.

Q. Okay. So depending on the circumstances of the case, you would set aside your religion?

A. Oh—

Q. Again, we're not trying to put you in a position you can't be in.

A. I understand.

Q. We're just trying to find out—because if you're on the jury and you realize you couldn't, it would be too late for you to give both sides a fair trial.

Q. So that's why we ask you up front. So tell me about it again, just tell me what your feelings are about the death penalty.

A. If I put my religion aside, if it wasn't my religion, I believe in it, I will go for the death penalty.

Q. Yes, ma'am. But do you understand you don't have to put your religion aside?

A. I understand.

Q. When you go back there, you are who you are.

A. I am who I am, uh-huh.

Q. Now, knowing you do not have to put your religion aside, would that put you in a position that you couldn't deal with by being on the jury and having to determine the death penalty?

A. I could deal with it. I know I can deal with it because I believe in God. So I could deal with it.

Q. Could you do it if you thought it were appropriate? Could you return a death penalty verdict and sign your name on a death penalty warrant?

A. If it was appropriate, yes.

Q. Appropriate is a term that you would have to make a determination after you hear the facts. Are there—have you had an opportunity to think about the death penalty other than in your—in the sense of your religion?

A. I did thought about it . . . . (brief colloquy with court)

Q. What religion are you?

A. I'm a Methodist.

Q. And what is the teaching of that religion regarding the death penalty?

A. Thou shall not kill.

Q. Would that affect your ability to deliberate on a jury?

At this point, counsel for Sapp objected that she had already answered the question and the court overruled the objection, finding this a critical issue. The court then queried whether

Ms. McNair needed a moment. (The court reporter's note indicates the juror was crying). The trial court indicated the record was to reflect that the juror was emotionally distraught.

After discussing the matter with counsel, the trial court ruled:

> Considering the answers given by Ms. McNair, observing also her demeanor in the courtroom during the examination and the questions propounded by the solicitor, which she never answered, became so emotionally distraught by the question, "Would that affect your ability to deliberate on a jury," and she never answered the question. Given her answers and her inconsistency or the inconsistency of her answers, given the feelings that she articulated to my questions and to the solicitor's questions that her religious beliefs were very sincere and deep seeded with her in her life, I would conclude that her inability to answer the question affecting her ability to deliberate and constantly apologizing is a human reaction to suggest that she couldn't consider it. And therefore, she felt inadequate because she couldn't. And that would be the only justification for somebody becoming emotionally distraught and apologizing. So given that and given her demeanor and considering the totality and completeness of her answers, I would agree that she's not qualified. And the record is clear that Mr. Sapp finds and would argue that she is qualified and has stated—clearly I don't argue with the position that she indicated at one point that, yes, she could invoke—award the death penalty. But I believe it would substantially affect her ability to consider both sentences, that is her religious belief.

Sapp asserts the trial court erred in excusing McNair for cause. We disagree. We find the record fully supports the trial court's removal of the juror.

 The exclusion of venire persons simply because they voice general objections to the death penalty or express conscientious or religious scruples against its infliction is unconstitutional. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). However, a prospective juror may be excluded for cause when his views on capital

punishment are such as would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). *See also State v. Wood,* 362 S.C. 135, 607 S.E.2d 57 (2004), *cert. denied* —— U.S. ——, 125 S.Ct. 2942, 162 L.Ed.2d 873 (2005); *State v. Council,* 335 S.C. 1, 515 S.E.2d 508, *cert. denied,* 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999); S.C.Code Ann. § 16–3–20(E) (juror may not be excused in a death penalty case unless his beliefs or attitudes against capital punishment would render him unable to return a verdict according to law). When reviewing the trial court's qualification or disqualification of prospective jurors, the responses of the challenged jurors must be examined in light of the entire *voir dire. Council, supra.* The determination of whether a juror is qualified to serve on a death penalty case is within the sole discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the evidence. *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992), *cert. denied,* 508 U.S. 915, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993), *overruled on other grounds, Brightman v. State,* 336 S.C. 348, 520 S.E.2d 614 (1999). The ultimate consideration is that the juror be unbiased, impartial, and able to carry out the law as explained to him. *Id.* On review, the trial court's disqualification of a prospective juror will not be disturbed where there is a reasonable basis from which the trial court could have concluded that the juror would not have been able to faithfully discharge his responsibilities as a juror under the law. *State v. Green,* 301 S.C. 347, 392 S.E.2d 157, *cert. denied,* 498 U.S. 881, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990). *See also Wainwright, supra,* (there will be situations where the trial court is left with the definite impression that prospective juror would be unable to faithfully and impartially apply the law and this is why deference must be paid to trial court who sees and hears the juror).

Here, McNair unequivocally stated, at the outset, that she could not consider the law regarding imposing the death penalty because of her religious beliefs, going on to apologize and state that "I can't decide that because of my religion." After being questioned by the solicitor as to whether she could put aside her religion if she was on a death penalty jury and the other 11 members agreed on a sentence of death, she

eventually stated that she probably would. Ultimately, however, when questioned as to whether the Methodist teaching that "Thou shalt not kill" would affect her ability to deliberate on the jury, McNair broke down in tears and was unable to answer the question.

Given the deference which is afforded to trial courts in assessing a death penalty juror's qualification, and McNair's initial responses that she could not vote for death due to her religious beliefs, we affirm the trial court's disqualification of McNair. *Accord Commonwealth v. Duffey,* 579 Pa. 186, 855 A.2d 764 (2004) (where voir dire indicated juror was somewhat unclear as to her convictions regarding imposition of the death penalty, and these concerns could have substantially impaired her ability to function as an impartial juror, the trial court was in the best position to make that determination and did not abuse its discretion in dismissing the prospective juror for cause).

## 2. ACCOMPLICE'S OPINION OF SENTENCE

■■ At sentencing, counsel for Sapp cross-examined Kathryn Boles, the driver of the pick-up truck and Sapp's former girlfriend, as to her relationship with Sapp. After stating that she was not "in love" with Sapp, but did love him, counsel asked whether she would like to see him put to death. The state objected that the question was inappropriate, and the court sustained the objection. Sapp contends Boles should have been permitted to respond to his inquiry. Although we agree that Boles should have been allowed to testify as to whether she wished to see Sapp put to death, her failure to respond to this question was in no way prejudicial.

In *State v. Johnson,* 338 S.C. 114, 525 S.E.2d 519, *cert. denied,* 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000), this Court stated:

In *[State v.] Torrence,* we adopted the Georgia Supreme Court's distinction between a plea for mercy and the ultimate question to be decided by the jury: "[A]lthough a defendant may present witnesses who know and care for him and are willing on that basis to ask for mercy on his behalf, a defendant may not present witnesses to testify merely to their religious and philosophical attitudes about the death penalty.... Nor is a defendant entitled to present

the opinion of a witness about what verdict the jury 'ought' to reach." *Torrence*, 305 S.C. at 45, 51, 406 S.E.2d 315, at 318 (quoting *Childs v. State*, 257 Ga. 243, 357 S.E.2d 48, 60 (1987)).

In *Johnson*, notwithstanding the ruling that the trial court should have permitted Johnson to inquire of his sister whether she wanted him to die, we found no prejudice to Johnson because the sister was able to make a general plea for mercy on her brother's behalf in the form of testimony concerning their abusive family life, and the fact that she expressed her love and affection for Johnson at trial.

More recently, in *State v. Wise*, 359 S.C. 14, 596 S.E.2d 475, 481–482, *cert. denied* 543 U.S. 948, 125 S.Ct. 355, 160 L.Ed.2d 263 (2004), we addressed the issue of whether the trial court erred in refusing to allow a surviving victim to testify on cross-examination during the sentencing phase of the trial that he did not personally believe Wise should receive the death penalty. We reiterated our holding in *Johnson*, stating, "[a] close relative of a defendant, such as his sister, may be asked whether she wants the defendant to die, which is akin to asking her to make a general plea for mercy and not explicitly directed toward eliciting her opinion of what verdict the jury should reach." 359 S.C. at 26, 596 S.E.2d at 481.[2]

Under *Johnson* and *Wise*, Boles should have been permitted to answer the question as to whether she would like to see Sapp put to death. However, we find no prejudice. Initially, it is implicit from Boles' testimony that she would have answered that she did not wish to see Sapp put to death. Further, given Boles' testimony that she loved Sapp and had known him for years, we find her testimony akin to that in

---

**2.** However, in *Wise*, we held the trial court properly prohibited the defendant from inquiring of a security officer who had been shot by Wise whether he thought Wise should be sentenced to death, stating, "[w]e accept as true the proffer by Appellant's attorney Vance would testify he told the media shortly after the shootings he did not personally believe Appellant should receive the death penalty. However, such a statement by Vance would not constitute a plea for mercy on behalf of Appellant. Instead, it would constitute Vance' opinion of what verdict—life in prison versus the death penalty—the jury should reach. Accordingly, the trial judge properly disallowed the question, recognizing it was an attempt to elicit an inadmissible opinion from a witness." 596 S.E.2d at 482.

*Johnson* in which Johnson's sister was able to express her love for him.

In addition, Sapp's mother testified at sentencing, stating, "I'm begging you, please don't take my son's life. To take my son's life is not going to bring back Corporal Johnson ... Please if you kill my son, you're going to devastate the community again and more and more families. Please don't do it. Please don't kill him." Sapp's nine-year old nephew James also testified that if Sapp were gone from him, it would be the worst thing ever. In light of this testimony, Sapp cannot demonstrate prejudice. *See State v. Myers,* 359 S.C. 40, 596 S.E.2d 488, *cert. denied,* 543 U.S. 980, 125 S.Ct. 485, 160 L.Ed.2d 359 (2004) (exclusion of testimony is harmless where it is cumulative to other testimony in the record); *State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985); *State v. Gaskins,* 284 S.C. 105, 127, 326 S.E.2d 132, 145 (erroneous admission of evidence in sentencing phase may be reviewed for harmless error), *cert. denied,* 471 U.S. 1120, 105 S.Ct. 2368, 86 L.Ed.2d 266 (1985), *overruled in part on other grounds State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991).

## PROPORTIONALITY REVIEW

 We have conducted a proportionality review pursuant to S.C.Code Ann. § 16–3–25(C) (2003). We find the death sentence was not the result of passion, prejudice, or any other arbitrary factor. Furthermore, a review of prior cases shows the death sentence in this case is proportionate to that in similar cases and is neither excessive nor disproportionate to the crime. *See State v. Hughes,* 336 S.C. 585, 521 S.E.2d 500 (1999), *cert. denied* 529 U.S. 1025, 120 S.Ct. 1434, 146 L.Ed.2d 323 (2000); *State v. Johnson,* 306 S.C. 119, 410 S.E.2d 547 (1991), *cert. denied,* 503 U.S. 993, 112 S.Ct. 1691, 118 L.Ed.2d 404, (1992); *State v. South,* 285 S.C. 529, 331 S.E.2d 775, *cert. denied* 474 U.S. 888, 106 S.Ct. 209, 88 L.Ed.2d 178 (1985).

**AFFIRMED.**[3]

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.

---

**3.** The remaining issues are affirmed pursuant to Rule 220(b)(1), SCACR, and the following authorities: Sapp's Issue 2–*In re McCracken,*

346 S.C. 87, 93, 551 S.E.2d 235, 238–39 (2001) (contemporaneous objection is required to preserve issues regarding a closing argument for review); *State v. Wiggins,* 330 S.C. 538, 550, 500 S.E.2d 489, 496 (1998) (failure to object to comments made during argument precludes appellate review of the issue); Sapp's Issue 4—*State v. Humphries,* 325 S.C. 28, 479 S.E.2d 52 (1996), *cert. denied* 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997) (failure to request charge on additional statutory mitigating circumstances precludes review of issue on appeal); Sapp's Issue 5—*State v. Crisp,* 362 S.C. 412, 608 S.E.2d 429, 433–434 (2005) (aggravating circumstances need not be alleged in indictment for murder); *State v. Gentry,* 363 S.C. 93, 610 S.E.2d 494 (2005) (alleged defects in indictment do not deprive trial court of subject matter jurisdiction).