642 S.E.2d 557

**The STATE, Respondent,**

v.

**Marion Alexander LINDSEY, Appellant.**

**No. 26268.**

Supreme Court of South Carolina.

Heard Jan. 17, 2007.

Decided Feb. 20, 2007.

Rehearing Denied April 4, 2007.

Deputy Chief Attorney for Capital Appeals Robert M. Dudek and Appellate Defender Aileen P. Clare, both of South Carolina Commission on Indigent Defense, of Columbia; and Karen Michelle Quimby, of The Brannon Law Firm, of Spartanburg, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, of Columbia; and Solicitor Harold W. Gowdy, III, of Spartanburg, for respondent.

Justice MOORE:

Appellant killed his estranged wife, Ruby Nell Lindsey (Victim), on September 18, 2002, in the parking lot of the Inman City Police Department. The jury found a statutory aggravator pursuant to S.C.Code Ann. § 16–3–20(C)(a)(3) (2003) and appellant was sentenced to death. We affirm.

## FACTS

Celeste Nesbitt, a close friend of Victim, was the State's witness-in-chief. On the day of the murder, Celeste gave Victim a ride home from work at about 8:00 p.m. In the car were Celeste's two young daughters, four-year-old Keysha and ten-year-old Kiera, who were in the back seat with Victim—Keysha in a car seat behind the front passenger seat, Kiera in the middle, and Victim behind the driver's seat. Celeste was driving and Celeste's mother was in the front passenger seat. The car was a Mercury sedan with dark tinted rear windows.

Victim was separated from appellant at the time and was staying with her mother. As they neared Victim's mother's house, they saw appellant in his girlfriend's car. Celeste pulled into the yard and turned the car around so appellant was facing them in a head-on direction. Celeste rolled down her window and greeted him. Appellant asked her if she had seen Victim. Because Celeste knew appellant had threatened to kill Victim, she lied and answered that she had not seen her in three days.

Celeste's youngest daughter, Keysha, leaned forward in her car seat and greeted appellant. Appellant then asked who else was in the back seat. Celeste told him Kiera, her older daughter, was lying on the back seat asleep. Because the windows were tinted, appellant asked Celeste to roll down the window so he could see. Celeste answered that the window was broken. When appellant said he would get out to look, Celeste sped off.

Celeste drove to the police department without stopping while Victim dialed 911. When they arrived, Celeste jumped out of the car and urged Victim to get out. Victim was still in the back seat when appellant pulled into the parking lot and ran toward the back of Celeste's car. Celeste saw him pull

out a gun and shoot into the car through the rear windshield. She dove for cover as she heard additional shots.

Officer Godfrey was in the police department parking lot when the dispatcher informed him there was a "rolling domestic," meaning a domestic dispute involving a vehicle. He saw the two cars pull into the parking lot, and saw appellant jump out and fire two rounds into Celeste's car. Officer Godfrey took cover and saw two more flashes from a gun. Appellant came around the front of the car and pointed his gun at Officer Godfrey who then fired four rounds at appellant. Appellant was wounded and fell to the ground.

Victim died at the scene. Four bullets from appellant's gun were recovered: three from Victim's head and one from the trunk of Celeste's car.[1] The bullet recovered from the trunk had traveled through the back seat of the car into the trunk. The car had two bullet holes in the rear driver's side window and two in the rear windshield.

Other evidence indicated that during their marriage, appellant struck Victim several times in front of witnesses. In December 2001, he beat her in a restaurant parking lot and left the scene before the responding officer could arrest him. On September 17, 2002, the night before the murder, appellant was arrested on a warrant for criminal domestic violence arising from this incident. He was released on a $1,000 bond; one of the conditions of bond was that he have no contact with Victim.

### ISSUES

1. Was Juror K improperly disqualified?
2. Should the trial judge have dismissed Juror M for misconduct during the jury's view of the car?
3. Should a directed verdict have been granted on the aggravating circumstance?
4. Is the death sentence in this case disproportional to other death penalty cases?

---

1. Five shell casings were found but the fifth bullet was not recovered. A paramedic testified for the defense that when he arrived on the scene to transport appellant to the hospital, appellant said he had shot himself in the head.

## DISCUSSION

### 1. Juror disqualification

■ Appellant claims the trial judge erred in excusing Juror K who was disqualified because of his views regarding the death penalty.

During initial questioning by the court, Juror K was asked if he could impose the death penalty. He answered, "I don't know. I really don't know if I could or not." During subsequent voir dire by defense counsel, the juror gave the following responses.

Q: .... There are going to be some allegations of domestic abuse in this case. Would that affect your ability to give either side a fair trial?

A: No, sir.

Q: Would that affect your ability—in the penalty phase, would that influence your decision as to whether or not life or death would be appropriate?

A: I don't know, sir.

Q: In other words, and I don't want to put words in your mouth, but as I understand what you are saying is you will be able to listen to both sides in the penalty phase and render what you feel to be the most appropriate penalty whether it be life or whether it be death?

A: Right.

Q: You will be able if you felt death was appropriate, you would be able to impose the death penalty?

A: Yes.

Upon questioning by the solicitor, however, Juror K equivocated.

Q: .... I noticed in your questions to (sic) the Judge, you were hesitant about the death penalty. You just did not know about it?

A: Right.

Q: You know life without parole is an option. He would never get out if he gets life without parole. With death being an option to you, would you ever give death in a case?

A: Most of the time I feel it is a better punishment to be in prison for life. I believe that death is not as big of a punishment as going to prison for life and having to stay in prison for the rest of your life.

Q: You feel life without parole would be a better sentence?

A: Yes, for something that is—I believe that is worse than the death penalty.

Q: So that would be the better option to you between the two?

A: Yeah.

Q: Would that be the option you would give the most cases or all cases?

A: I am not positive. I don't know for sure.

Q: You don't know what you would do?

A: Right, exactly.

Q: Your belief is that life without parole is a more serious punishment than the death penalty?

A: Yes.

Q: That would be the option you would choose?

A: Not necessarily but most likely.

Q: Most likely you would do that?

A: Yes.

Q: So substantially that will be your view concerning the case no matter what the facts would be, that would be your view?

A: Yes.

Defense counsel then re-examined the juror.

Q: ... just so that everybody understands. You feel when given the choice between which would be worse, life in prison without parole or death, you feel that life is a worse punishment?

Q: I believe so, yes.

A: However, just so that I understand, if you felt death was appropriate in a case, you could give it?

Q: Yes, I could.

The solicitor then followed up with one last question:

Q: If I understood when we were talking or whatever, you wouldn't basically look at the facts of the case, you would look at life without parole being the worse punishment of the two based on your beliefs, is that right, sir?

A: Yes.

The trial judge found that the belief that life in prison was worse than death would substantially impair the juror's ability to follow the law as instructed. He further noted that when asked about giving the death penalty, Juror K "took a very big deep [breath] and exhaled as if he were very uncertain as to whether or not he could do that." The judge concluded "from watching him" and considering his inconsistent responses, that Juror K should be excused.

 A prospective juror may be excluded for cause when his or her views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *State v. Sapp*, 366 S.C. 283, 621 S.E.2d 883 (2005) (*citing Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)); *State v. Wood*, 362 S.C. 135, 607 S.E.2d 57 (2004); *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999); S.C.Code Ann. § 16–3–20(E) (2003) (juror may not be excused in a death penalty case unless his beliefs or attitudes against capital punishment would render him unable to return a verdict according to law). When reviewing the trial court's qualification or disqualification of prospective jurors, the responses of the challenged juror must be examined in light of the entire voir dire. *Sapp, supra.* The determination whether a juror is qualified to serve in a capital case is within the sole discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the evidence. *Id.* A juror's disqualification will not be disturbed on appeal if there is a reasonable basis from which the trial court could have concluded that the juror would not have been able to faithfully discharge his responsibilities as a juror under the law. *Id.*; *State v. Green*, 301 S.C. 347, 392 S.E.2d 157 (1990). Deference must be paid to the trial court who sees and hears the juror. *Wainwright, supra.*

Juror K's equivocal views regarding the death penalty, his responses favoring a life sentence despite the facts of the case, and his noted hesitation when asked if he could vote for death, are a reasonable basis for the trial judge's conclusion that Juror K's views would substantially impair his ability to act as an impartial juror. Considering the voir dire as a whole, we find the trial judge did not abuse his discretion in excusing this juror.

### 2. Jury view

■ During the sentencing phase, over appellant's objection, the trial judge granted the State's request for a jury view of Celeste's car.[2] After the viewing, defense counsel stated an objection that he saw Juror M

> "using his arm as a dowel or a measurement. He measured both the front driver's seat and the back seat of the automobile I'm assuming to get an idea of the position of the people.... What he did was he stuck his arm from the door jam to determine the length from the door jam to the middle of the head rest in the front. He did the same thing in the back. He stuck it, he put his arm, he was attempting to use the length of his arm to estimate distance is what it appeared to me."

The solicitor, on the other hand, stated that he thought the juror was simply testing the tint of the car window.

Appellant moved to have Juror M removed and an alternate juror seated. The trial judge found Juror M had done nothing improper and denied the motion. Appellant contends Juror M should have been dismissed because he conducted his own experiment.

■■ A jury may be allowed to view the scene or pieces of evidence but it is improper for the jury to conduct its own experimentation. *Stone v. City of Florence*, 203 S.C. 527, 28 S.E.2d 409 (1943). The issue is what constitutes "experimentation" such that it rises to the level of juror misconduct. Jurors will not be presumed guilty of misconduct and acts that

---

2. Appellant objected that seeing the car would be unfairly prejudicial because instead of focusing on the "spatial relationships" in the car, the jury would be affected by the fact that Victim had been killed there.

are merely incidental to an assessment of the evidence are not improper. *Id.*; *see also State v. Burckhalter,* 153 S.C. 487, 151 S.E. 64 (1930) (not improper experimentation in trial for possessing contraband to allow jury to take liquor into jury room to smell or taste it). However, an attempted re-enactment of the facts at issue will render a juror's conduct improper. *See, e.g., State v. Ballew,* 83 S.C. 82, 63 S.E. 688 (1909)(jurors attempted to throw a hatchet against the wall of a jail cell to re-enact the prosecutor's description of the crime); *Baroody v. Anderson,* 195 S.C. 422, 11 S.E.2d 860 (1940) (jury asked the sheriff to drive his car around the curve where the wreck occurred at 35 mph in order to observe it approaching).

We find the trial judge did not abuse his discretion in refusing to dismiss Juror M. *See State v. Simmons,* 360 S.C. 33, 599 S.E.2d 448 (2004) (within trial judge's discretion to substitute alternate juror). First, it is not clear the juror was actually "taking measurements," as appellant claims, and we will not presume a juror engaged in misconduct. There was no attempted re-enactment of the crime, rather Juror M's actions were merely incidental to an assessment of the evidence. Moreover, photographs in evidence show the car's back seat, where the bullet hole was, where the child's car seat was, and where Victim was sitting. There is no real dispute regarding the measurements of the back seat such that any "measurements" by Juror M would have carried undue weight in jury deliberations.

### 3. Directed verdict on aggravating circumstance

■ Appellant moved for a directed verdict on the statutory aggravator provided in § 16-3-20(C)(a)(3) which states:

That the offender by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which normally would be hazardous to the lives of more than one person.

Appellant contends that because he shot Victim at close range and no other person was endangered, this aggravator should not apply as a matter of law.

■ The trial judge should submit a statutory aggravator to the jury if there is any evidence, direct or circumstantial, to support it. *State v. Locklair,* 341 S.C. 352, 535 S.E.2d 420

(2000). Here, the police department parking lot is clearly a public place and a gun is a weapon hazardous to more than one person. *Id.* (shooting in church parking lot). Further, appellant knew there were other occupants in the car with Victim when he shot multiple times into the confined space of the car's interior—conduct a reasonable person would know presents a great risk of harm to more than one person. Appellant also pointed his gun at Officer Godfrey in the parking lot. This evidence supports the submission of the statutory aggravator to the jury.

### 4. Proportionality review

■■■ Appellant contends the imposition of death in his case is disproportionate to other death penalty cases because his case involves only a single victim and resulted from a domestic dispute. *See* S.C.Code Ann. § 16–3–25 (2003) (proportionality review).

We find no support for appellant's attempt to reduce this crime to simply "a domestic dispute." Appellant's culpability is not lessened by the fact that the victim was his wife. There is no evidence of any immediate dispute leading up to the murder,[3] much less any provocation on Victim's part. In fact, appellant intentionally violated a court order forbidding contact with Victim.

Further, as discussed above, the evidence supports the submission of the aggravating factor in this case. The legislature has determined that a unanimous verdict on only one aggravating factor is sufficient to support the death penalty. There have been numerous capital cases where the jury found only a single aggravator and death was imposed. *See, e.g., State v. Aleksey,* 343 S.C. 20, 538 S.E.2d 248 (2000) (killing police officer); *State v. Rogers,* 338 S.C. 435, 527 S.E.2d 101 (2000) (killing child under age of eleven); *State v. Huggins,* 336 S.C. 200, 519 S.E.2d 574 (1999) (armed robbery); *Ray v. State,* 330 S.C. 184, 498 S.E.2d 640 (1998) (kidnapping); *State v. Atkins,* 303 S.C. 214, 399 S.E.2d 760 (1990) (prior murder conviction). We find appellant's disproportionality argument without merit.

---

**3.** Appellant's mother testified generally in the sentencing phase that appellant was upset he was not allowed to see his children.

We have reviewed the record and conclude the imposition of death in this case was not the result of passion, prejudice, or any other arbitrary factor, nor is it excessive or disproportionate to the penalty imposed in other cases. The judgment of the circuit court is

**AFFIRMED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.