645 S.E.2d 904

**The STATE, Respondent,**

v.

**Fredrick Antonio EVINS, Appellant.**

**No. 26329.**

Supreme Court of South Carolina.

Heard March 8, 2007.
Decided May 14, 2007.
Rehearing Denied June 21, 2007.

408

410

Deputy Chief Attorney for Capital Appeals Robert M. Dudek, and Appellate Defender Aileen P. Clare, both of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Derrick K. McFarland, all of Columbia, and Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

Chief Justice TOAL:

Appellant Fredrick Antonio Evins ("Evins") was convicted of murder, first degree criminal sexual conduct (CSC), and grand larceny. He was sentenced to death for the murder, thirty years imprisonment for CSC, and five years for grand larceny. This appeal consolidates his direct appeal with the mandatory review provisions of S.C.Code Ann. § 16–3–25 (1985). We affirm the convictions and sentences.

## FACTUAL/PROCEDURAL BACKGROUND

The victim in this case, Rhonda Ward ("Ward"), was the manager of a convenience store in Spartanburg. One early morning in February 2003, Evins approached Ward in the parking lot of the store on her way into work. Ward spoke to Evins briefly before he lead her back to her car where she got in the driver's side and he got into the passenger side. Surveillance cameras at the store captured the exchange between Ward and Evins. Two days later, Ward's naked body was found face down in an apple orchard. She had been sexually assaulted and stabbed twelve times.

After police discovered Evins had been driving Ward's car on the day of the murder, he was arrested and subsequently

confessed to Ward's murder. Initially, Evins denied having had sex with Ward; instead, he claimed another man was with him in the woods and insisted that Evins kill Ward. However, upon being taken to the hospital for DNA testing, Evins admitted he had had sex with Ward on the day of her death. At trial, Evins claimed he and Ward had been engaged in a long-term consensual sexual relationship. He testified that on the day of her death, he and Ward were engaged in sexual intercourse outside in an apple field, when Ward became angry with him for refusing to leave his girlfriend. According to Evins, Ward wielded a knife, and wound up getting stabbed.

The jury convicted Evins of murder, kidnapping, first de-gree CSC, and grand larceny. After a separate sentencing phase, Evins was sentenced to death for murder, thirty years for CSC and five years for grand larceny. Evins raises the following issues for this Court's review: [1]

I. Did the trial court err in denying Evins' motion for a change of venue based on pre-trial publicity?

II. Did the trial court err in ruling the state's exercise of peremptory challenges did not violate *Batson v. Kentucky?*

III. Did the trial court err in excusing three African–American potential jurors for cause?

IV. Did the trial court err in admitting certain photographs of the victim's body at sentencing?

## LAW/ANALYSIS

### I. Pre-trial Publicity–Change of Venue

In September 2002, approximately five months prior to the murder in this case, the body of a woman named Demaris Huff was found near a creek beside a walking trail near a park in Spartanburg. She had been strangled and was nude except for a pair of socks. DNA testing revealed that semen found on Huff matched that of Evins. The case remained unsolved until Evins' subsequent arrest for the February 2003 murder of Ward. At that time, after DNA testing, authorities also charged Evins with Huff's murder. The Huff murder charges

---

1. We have re-framed the seven issues raised by Evins.

were pending at the time of Evins' trial for the murder of Ward.

Evins moved for a change of venue based upon extensive pre-trial publicity, much of which linked Evins to both murders. The trial court ruled in a pre-trial hearing that it would allow Evins latitude in the *voir dire* of potential jurors to determine if they had any prior knowledge of Evins and/or the Huff murder. At the conclusion of *voir dire*, the defense renewed its motion for a change of venue, indicating that a total of thirty-nine people out of the jury pool of sixty-eight had heard something about the case. By defense counsel's count, seven of the twelve jurors seated had some knowledge of the case. The trial court declined to change venue, concluding that all of the jurors who had any prior knowledge of the case had indicated they could set aside any information and would not consider it. The court also noted the defense had used only nine of its ten peremptory challenges to remove potential jurors. Evins now contends the denial of his motion to change venue constituted an abuse of discretion. We disagree.

A motion to change venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *Sheppard v. State*, 357 S.C. 646, 594 S.E.2d 462 (2004); *State v. Manning*, 329 S.C. 1, 495 S.E.2d 191 (1997) (finding trial court abused discretion by granting the State's motion to change venue based on pretrial publicity because no evidentiary facts supported finding of actual juror prejudice towards the State). When a trial judge bases the denial of a motion for a change of venue because of pretrial publicity upon an adequate *voir dire* examination of the jurors, his decision will not be disturbed absent extraordinary circumstances. *State v. Caldwell*, 300 S.C. 494, 388 S.E.2d 816 (1990). When jurors have been exposed to pretrial publicity, a denial of a change of venue is not error where the jurors are found to have the ability to set aside any impressions or opinions and render a verdict based on the evidence presented at trial. *State v. Tucker*, 334 S.C. 1, 512 S.E.2d 99 (1999); *Manning*, 329 S.C. at 1, 495 S.E.2d at 191. Therefore, mere exposure to pretrial publicity does not automatically disqualify a prospective juror. *Id.* The relevant question is not whether the community remembered the case, but wheth-

er the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant. *Id.* It is the defendant's burden to demonstrate actual juror prejudice as a result of such publicity. *Caldwell,* 300 S.C. at 494, 388 S.E.2d at 816.

In *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the United States Supreme Court found reversible error in a trial court's refusal to grant a motion for a change of venue due to the effect of pretrial publicity. There, the Court found that the people of Calcasieu Parish in Lake Charles, Louisiana, were "exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged." *Id.* The Court noted that three members of the jury which convicted Rideau had seen and heard Rideau's televised "interview" in which he confessed to the sheriff, and that two members of the jury were deputy sheriffs of Calcasieu Parish. *Id.* The Court found Rideau's due process rights had been compromised by such a procedure. *Id.* The present case is clearly inapposite.

We find Evins has demonstrated no prejudice from the denial of his motion. Both the trial court and defense counsel conducted a thorough *voir dire* of the jury pool. Additionally, all members of the jury who had any knowledge of Evins or the Huff murder due to pre-trial publicity indicated they could put that knowledge aside. Further, the defense used only nine of its peremptory challenges. Evins contends, however, that one juror had read about both crimes and connected them mentally such that "she could not be expected to disregard the image created by the articles." Evins' depiction of the juror's response is overstated. The juror testified on *voir dire* that the only thing she had heard was that the crime had taken place; she specifically testified that she knew no details, did not know the location, she had formed no opinion, could put aside what she had heard, and could be fair and impartial. This is simply not akin to the situation in *Rideau.*

We find this case more akin to *Sheppard,* 357 S.C. at 646, 594 S.E.2d at 462, in which the defendant claimed he was entitled to a change of venue due to extensive pretrial publicity where, out of eighty-seven potential jurors, all but five had

been exposed to pretrial publicity. Noting our holdings in *Manning* and *Caldwell*, we found the defendant had not met his burden of demonstrating actual juror prejudice as a result of the publicity. *Sheppard*, 357 S.C. at 655, 594 S.E.2d at 468. We held, "[m]ere exposure to pretrial publicity does not automatically disqualify a prospective juror. Instead, the relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.*

Moreover, Evins concedes that evidence of the Huff murder was properly admitted at the sentencing phase of trial. Accordingly, Evins' complaint regarding pretrial publicity is necessarily limited to the guilt phase of his trial. Given the overwhelming evidence presented during that phase of trial, and the fact that Evins actually admitted to stabbing Ward, we find Evins has suffered no prejudice. Accordingly, the trial court's denial of the motion to change venue is affirmed.

## II. *Batson* Motion

Evins next asserts the trial court erred in denying his *Batson*[2] motion and ruling that two of the State's peremptory challenges were not racially motivated. We disagree. We find the solicitor's stated reasons for striking the jurors were race-neutral.

There were a total of twelve African–American venire members out of the pool of sixty-three potential jurors. During jury selection, the state exercised a total of seven peremptory challenges, striking three African American and four white potential jurors. The jury was ultimately comprised of eleven white jurors, one black juror, and one each white and black alternate. Evins complains that two of the African–Americans were struck in violation of *Batson*.[3] We disagree.

In response to Evins' *Batson* motion, the solicitor explained that he struck Juror # 78 because she had recently lost two sons in a felony DUI, for which the perpetrator had received

---

**2.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**3.** Evins does not contest the strike of Juror # 154 on appeal.

only a six-year sentence. The solicitor was concerned that the juror would weigh the sentence given to the defendant of a felony DUI in which her sons were killed with the potential death sentence she would be considering in Evins' case. Additionally, he addressed the fact that the solicitor's office prosecuted the case and the public defender's office defended the defendant. The trial court ruled the solicitor's explanation satisfied the test required in *Batson*.

As to the other juror, Juror # 399, the solicitor argued that the juror was "beyond vacillation on the death penalty. He is clearly life prone. And that's why we struck him." The trial court ruled the solicitor's reason was race-neutral, specifically stating, "I do agree with his assessment that [the juror] did appear to have—was one of the jurors with the largest problems with finding—would have one of the hardest times finding death. So I do agree with that."

Evins asserts the solicitor's stated reasons were mere pretext. We disagree.

The Equal Protection Clause of the Fourteenth Amendment to the Constitution prohibits the striking of a venire person on the basis of race or gender. *State v. Rayfield*, 369 S.C. 106, 631 S.E.2d 244 (2006); *State v. Shuler*, 344 S.C. 604, 545 S.E.2d 805 (2001). The proper procedure for a *Batson* hearing is set forth in *State v. Adams*, 322 S.C. 114, 470 S.E.2d 366 (1996) (citing *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). After a party objects to a jury strike, the proponent of the strike must offer a facially race-neutral explanation. Once the proponent states a reason that is race-neutral, the burden is on the party challenging the strike to show the explanation is mere pretext, either by showing similarly situated members of another race were seated on the jury or that the reason given for the strike is so fundamentally implausible as to constitute mere pretext despite a lack of disparate treatment. *Adams*, 322 S.C. at 123–24, 470 S.E.2d at 371–72. The burden of persuading the court that a *Batson* violation has occurred remains at all times on the opponent of the strike. *State v. Haigler*, 334 S.C. 623, 515 S.E.2d 88 (1999).

"Typically, the decisive question becomes whether counsel's race-neutral explanation for a peremptory challenge

should be believed.... [T]here is seldom much evidence in the record bearing on that issue, and the trial court's findings regarding purposeful discrimination necessarily will rest largely on the evaluation of demeanor and credibility of counsel. Therefore, those findings are given great deference and will not be set aside unless clearly erroneous." *State v. Cochran*, 369 S.C. 308, 631 S.E.2d 294 (Ct.App.2006) *citing State v. Guess*, 318 S.C. 269, 457 S.E.2d 6 (Ct.App.1995).

As this Court held in *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998), the right to serve on a jury and not to be discriminated against because of race or gender belongs to the potential juror, not a litigant. This is so because a defendant has no right to trial by a particular jury. *Adams*, 322 S.C. at 126, 470 S.E.2d at 373.

We find the record supports the trial court's finding that the state's explanation for its peremptory challenges of these two jurors were race-neutral. The fact that Juror # 78 had had two sons killed in a felony DUI, and the perpetrator had received only six years imprisonment was sufficient reason for the solicitor to believe that this juror might be reluctant to impose a death sentence. Moreover, when initially questioned by the trial court as to whether she could be a fair and impartial juror, she responded, "well, your Honor, I done been through this before, so it would be kind of hard for me to, you know . . ." When questioned further as to whether she could find a defendant either guilty or not guilty depending on what she heard, she went on to state, "Well, to be truthful, I don't know.... Your Honor, I still—I can't make up my mind. I don't know what happened to my two sons, and I haven't got over it yet." Although she ultimately testified that she would honor her oath if selected to be a fair and impartial juror, she nonetheless maintained when asked if she knew any reason why she could not serve on this jury that serving would be difficult for her. In sum, although her answers varied somewhat, we simply cannot say the solicitor's proffered reason for striking Juror # 78 was not race-neutral or that the solicitor's stated reasons were pretext.

As for Juror # 399, the solicitor's stated reason for striking him was that he was likely the most pro-life person in the jury venire. When asked whether he could serve as a fair and

impartial juror, he responded, "Possibly, I could, but I don't know." When questioned about whether he could sentence someone to death, he repeatedly stated, "That's a tough one.... Well, like I said, I never really thought about it, but that would still be just like killing somebody. I mean, that's basically, the same thing to me.... That's just what I— that's just he way I feel right now, you know. Like I say, I never really thought about it.... So, I mean, death is death...." When the trial court asked, "So, are—you don't— what you're telling me is that you don't believe in killing; is that right?," the juror responded, "Well, I like life better than death. That's a tough one, I'm going to tell you." When told by the trial court that they need to know where he stood, the juror concluded, "I probably could. But then again, I hear this little voice saying, you know, it's not right, but I probably could."

■■■■■■ Vacillating responses to *voir dire* questions regarding the death penalty will support the use of a peremptory strike against a *Batson* challenge. *State v. Bell*, 305 S.C. 11, 406 S.E.2d 165 (1991); *State v. Green*, 301 S.C. 347, 392 S.E.2d 157 (1990); *State v. Elmore*, 300 S.C. 130, 386 S.E.2d 769 (1989). Where the Solicitor perceives a person will have difficulty imposing the death penalty, he may exercise a peremptory challenge against that juror upon this ground as a racially neutral reason. *Bell*. 305 S.C. at 15, 406 S.E.2d at 168.

■■■■ Here, the juror's vacillation and reluctance to impose a death sentence is quite evident. Further, although Evins now points to several white jurors who were seated on the jury who also vacillated in their responses regarding a sentence of death, Evins did not raise this point at the time of his *Batson* challenge during the trial and therefore failed to meet his burden of demonstrating pretext to the trial court. In any event, the four white jurors cited by Evins on appeal simply did not vacillate in their responses to the same degree as Juror # 399. None of these jurors were nearly as equivocal in their responses concerning the death penalty. Accordingly, the trial court properly ruled the solicitor's stated reason for striking him was race-neutral, and Evins' *Batson* motion was properly denied.

### III. Juror Disqualification

Evins next contends the trial court erred in disqualifying three African American venire members from serving on the jury. Juror # 258 was disqualified because of her reluctance to impose a sentence of death; Juror # 182 was disqualified due to her predisposition to impose a sentence of death; and Juror # 134 was disqualified due to both his reluctance to impose a death sentence and the fact that he had charges pending against him for which he was being prosecuted by the solicitor, and represented by the Public Defender's office (which also represented Evins). Evins asserts these jurors were improperly disqualified. We disagree.

A prospective juror may be excluded for cause when his or her views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. S.C.Code Ann. § 16–3–20(E) (2003) (juror may not be excused in a death penalty case unless his beliefs or attitudes against capital punishment would render him unable to return a verdict according to law); *State v. Lindsey,* Op. No. 26268, 372 S.C. 185, 642 S.E.2d 557 (2007); *State v. Sapp,* 366 S.C. 283, 621 S.E.2d 883 (2005) (*citing Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). When reviewing the trial court's qualification or disqualification of prospective jurors, the responses of the challenged juror must be examined in light of the entire *voir dire. Id.* The determination whether a juror is qualified to serve in a capital case is within the sole discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the evidence. *Id.* A juror's disqualification will not be disturbed on appeal if there is a reasonable basis from which the trial court could have concluded that the juror would not have been able to faithfully discharge his responsibilities as a juror under the law. *State v. Green,* 301 S.C. 347, 392 S.E.2d 157 (1990). Deference must be paid to the trial court who sees and hears the juror. *Id.* There will be situations where a trial court is left with definite impression that prospective juror would be unable to faithfully and impartially apply the law and this is why deference must be paid to a trial court who sees and hears the juror. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

As discussed below, we find the trial court properly disqualified these jurors under *Wainwright*.

## A.   Juror # 258

Juror # 258 originally testified that she could not give the death penalty because she did not feel that it was her right to give a man death.  Juror # 258 then indicated she could impose a sentence of death under certain circumstances. When asked thereafter if she could sign her name to a verdict form imposing a sentence of death, Juror # 258 replied, "No." She explained the reason for this as being that given her job in the public, she could be a target for anybody, so she wouldn't want to sign her name.  When the trial court indicated her name would be protected, she indicated she could sign a verdict form for death.  When questioned by the solicitor, Juror # 258 vacillated between being opposed to the death penalty, and appearing to believe it would be appropriate for most murders.  Ultimately, however, when asked by the solicitor if she had a choice between life in prison or death, the juror answered that she would always pick life in prison.

Given the variations in Juror # 258's responses and statement that she would *always* pick life in prison over death, the trial court did not abuse its discretion in disqualifying her because it appears she could not have discharged her duties in accordance with the law.  *Id.*

## B.   Juror # 182

During *voir dire*, Juror # 182 stated she was a Type 3 juror who would hear all the evidence before deciding upon an appropriate sentence.  On examination by the solicitor, however, Juror # 182 strongly indicated that she would always give the death penalty to anyone who intentionally kills another.  Upon further examination, Juror # 182 explained that she would give life only to someone who unintentionally kills another, like self-defense.  Juror # 182 ultimately concluded that "if you intentionally kill somebody, you know what you were doing, death penalty, but self-defense, life sentence."

Again, it is clear this juror was predisposed to recommend a sentence of death in the case of an intentional killing such that there is a reasonable basis from which the trial court could have concluded she would not have been able to faithfully discharge her responsibilities as a juror under the law.  We

find she was properly disqualified under *Wainwright.* *See also State v. Sapp,* 366 S.C. at 283, 621 S.E.2d at 883.

### C. Juror # 134 .

When asked whether, after considering all of the aggravating and mitigating circumstances, he could return a sentence of death, Juror # 134 testified that he was not in favor of the death penalty and that he "really would have to be persuaded" to give the death penalty. Thereafter, when asked if he could sign his name to a death verdict, Juror # 134 responded that, depending on the facts, he could sign a death verdict form. However, he subsequently described himself as a Number 2 juror—a juror who would not give the death penalty. Upon further inquiry by the solicitor regarding the death penalty, Juror # 134 responded: "I've just always been the type that when I see it on TV or something about the death penalty, I'm always against it. There hasn't been one case yet where I said he deserves it."

We find the record supports the trial court's disqualification of Juror # 134.[4] *Wainwright,* 469 U.S. at 412, 105 S.Ct. 844 (holding that where trial court is left with definite impression that prospective juror would be unable to faithfully and impartially apply the law, it is within his discretion to disqualify a potential juror); *see also State v. Council,* 335 S.C. 1, 515 S.E.2d 508 (1999) (ultimate consideration of the judge concerning juror qualification is that the juror be unbiased, impartial and able to carry out the law as explained to him).

### IV. Sentencing Phase Photographs

Lastly, Evins asserts the trial court committed error at sentencing in admitting seven photographs of the victim, contending they served no legitimate purpose and served only to inflame the jury. In particular, Evins contests the admission of Exhibit numbers 70 and 71, which reveal that the

---

4. In addition to Juror # 134's views on the death penalty, the solicitor also explained to the court that Juror # 134 had charges pending against him for which he was being prosecuted by the solicitor's office and represented by the public defender's office. The solicitor argued that the combination of the juror's views on the death penalty and the pending charges disqualified Juror # 134. Because we find that Juror # 134 was properly disqualified on the basis of his views on the death penalty, we decline to address the issue of whether he was properly disqualified because of the pending charges.

victim had defecated on herself. We find the photographs were properly admitted.

The relevance, materiality and admissibility of photographs are matters within the sound discretion of the trial court, and the trial court's ruling on such issues will be disturbed only upon a showing of an abuse of discretion. *State v. Tucker,* 324 S.C. 155, 478 S.E.2d 260 (1996), *cert. denied,* 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997). The purpose of the sentencing phase in a capital trial is to "direct the jury's attention to the specific circumstances of the crime and the characteristics of the offender." *State v. Matthews,* 296 S.C. 379, 373 S.E.2d 587 (1988), *cert. denied,* 489 U.S. 1091, 109 S.Ct. 1559, 103 L.Ed.2d 861 (1989). Photographs may be offered as evidence in extenuation, mitigation, or aggravation. *State v. Haselden,* 353 S.C. 190, 577 S.E.2d 445 (2003). In the sentencing phase, the scope of the probative value of such photos is much broader than at the guilt or innocence phase. *Id. See also State v. Weik,* 356 S.C. 76, 587 S.E.2d 683 (2002); *State v. Franklin,* 318 S.C. 47, 456 S.E.2d 357 (1995). In determining whether to recommend a sentence of death, the jury may be permitted to see photographs which depict the bodies of the murder victims in substantially the same condition in which the defendant left them. *State v. Kornahrens,* 290 S.C. 281, 350 S.E.2d 180 (1986). There is no abuse of discretion if the offered photograph serves to corroborate testimony. *State v. Johnson,* 338 S.C. 114, 525 S.E.2d 519 (2000).

Exhibit 70 is a 4" × 6" photograph of the victim's body, taken from a distance of several feet away. It reveals the victim lying in a grassy field, naked and face down, with her right arm stretched up over her head, and her left arm bent and stretched out to the left. Upon close inspection, a small amount of feces is visible. Exhibit 71 is a photograph of victim's body taken from a further distance away, and was taken from an angle above the victim's head. The feces is not clearly visible in Exhibit 71. We find the photographs were properly admitted to show the victim in substantially the same condition as Evins left her, and to corroborate the testimony that the victim had defecated on herself. The photographs are not unnecessarily gruesome or disturbing. Accordingly, the trial court did not abuse its discretion in admitting the photographs.

## PROPORTIONALITY REVIEW

We have conducted the proportionality review as required by S.C.Code Ann. § 16–3–25(C), and we find the sentence in this case was not the result of passion, prejudice, or any other arbitrary factor. Furthermore, a review of similar cases illustrates that imposing the death sentence in this case would be neither excessive nor disproportionate in light of the crime and the defendant. *State v. Downs*, 361 S.C. 141, 604 S.E.2d 377 (2004) (death sentence warranted where defendant was convicted of murder, kidnapping, and first-degree criminal sexual conduct with a minor); *State v. Stokes*, 345 S.C. 368, 548 S.E.2d 202 (2001); *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999) *cert. denied* 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999); *State v. Tucker*, 319 S.C. 425, 462 S.E.2d 263 (1995) *cert. denied* 516 U.S. 1080, 116 S.Ct. 789, 133 L.Ed.2d 739 (1996).

## CONCLUSION

For the foregoing reasons, we affirm Evins' convictions and sentences.

**AFFIRMED.**

MOORE, BURNETT, PLEICONES, JJ., and Acting Justice EDWARD B. COTTINGHAM, concur.