720 S.E.2d 31

**The STATE, Respondent,**

v.

**Jerry Buck INMAN, Appellant.**

No. 27081.

Supreme Court of South Carolina.

Heard Sept. 21, 2011.
Decided Dec. 28, 2011.
Rehearing Denied Jan. 25, 2012.

540

Chief Appellate Defender Robert M. Dudek, and Senior Appellate Defender Joseph L. Savitz, III, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, of Columbia, and Solicitor William Walter Wilkins, III, of Greenville, for Respondent.

Justice BEATTY.

In this capital case, Jerry Buck Inman pleaded guilty to the murder, first-degree burglary, first-degree criminal sexual conduct, and kidnapping of a Clemson University student. The judge sentenced Inman to death for murder and two consecutive thirty-year sentences for first-degree burglary and first-degree criminal sexual conduct.[1]

On appeal, Inman challenges the judge's acceptance of his guilty plea as he contends it was conditional in that defense counsel maintained Inman was entitled to be sentenced by a jury despite his plea of guilty.[2] Additionally, Inman asserts the judge erred in addressing his allegations of prosecutorial misconduct arising out of the Solicitor's treatment of the defense's expert witness during the sentencing proceedings. Specifically, Inman claims the judge erred in the following respects: (1) refusing to recuse the Solicitor's Office from any further involvement in the case; (2) declining defense counsel's request to question the Solicitor on the issue of prosecutorial misconduct; and (3) declining to grant a mistrial despite a finding of prosecutorial misconduct. We affirm Inman's guilty plea and sentences.

## I. Factual/Procedural Background

### A.

On the evening of May 25, 2006, Tiffany Marie Souers (the Victim), a rising junior at Clemson University, was alone in her off-campus apartment as her roommates were gone for the day. When one of her roommates returned to the apartment during the afternoon of May 26, 2006, she discovered the Victim's partially-clad body on the bedroom floor. An autopsy revealed the Victim had been sexually assaulted and died as the result of asphyxia due to ligature strangulation with a bathing suit top.

---

1. The judge did not impose a sentence for the kidnapping charge as Inman had been sentenced for the related murder. S.C.Code Ann. § 16-3-910 (2003).

2. See S.C.Code Ann. § 16-3-20(B) (2003) (outlining bifurcated death penalty proceedings and stating "[i]f trial by jury has been waived by the defendant and the State, or if the defendant pleaded guilty, the sentencing proceeding must be conducted before the judge").

Surveillance photographs taken during the early morning hours of May 26, 2006 captured a male, whose face was covered by a bandana, attempting to use the Victim's ATM card at two different bank machines in Clemson.

On June 5, 2006, law enforcement was able to identify Inman as the Victim's perpetrator based on DNA evidence obtained from the crime scene and processed through the National DNA Database, which had Inman's DNA evidence on file due to his prior out-of-state convictions for sexual offenses in 1987 and 1988. Using this information, law enforcement conducted a well-publicized nationwide search for Inman. On June 6, 2006 at approximately 11:45 p.m., law enforcement apprehended Inman in Dandridge, Tennessee.

Shortly after his arrest, Inman orally confessed to the crimes involving the Victim. Within the course of the next three hours, Inman gave separate written statements to an agent with the Tennessee Bureau of Investigation and to agents with the South Carolina Law Enforcement Division (SLED). In these two statements, Inman again confessed to the charged crimes and recounted in detail the events underlying these crimes. When asked to sign these statements, Inman declined and stated "we still have to go to court."

Ultimately, Inman was extradited to South Carolina and detained in the Pickens County Detention Center where a DNA sample was taken from him and again conclusively matched to the DNA evidence recovered from the Victim and her apartment. Subsequently, a Pickens County grand jury indicted Inman for murder, kidnapping, first-degree criminal sexual conduct, and first-degree burglary. The Thirteenth Circuit Solicitor's Office timely served Inman with its intent to seek the death penalty.[3]

After a circuit court judge determined that Inman was competent to stand trial,[4] defense counsel filed a motion to determine the mode of trial. In the motion, counsel informed the judge of Inman's intent to enter a guilty plea to the crimes and demand a jury trial for sentencing. After a hearing, the judge summarily denied the motion on the ground he was

3. S.C.Code Ann. § 16–3–26(A) (2003).

4. S.C.Code Ann. § 44–23–410 (Supp.2010).

"constrained by the existing case law in South Carolina and the statutes."

## B.

On August 19, 2008, Inman pleaded guilty to murder, first-degree criminal sexual conduct, first-degree burglary, and kidnapping. During the plea colloquy, the judge informed Inman of the charges, the maximum possible sentences, and the constitutional rights that he was waiving by pleading guilty, including the right to a jury trial. Although Inman indicated he understood these rights, defense counsel interjected that Inman should be entitled to enter a guilty plea and then proceed to a jury trial for sentencing. In response, the judge informed Inman that he could not enter a plea "conditioned" on the preservation of the jury trial issue. Inman stated that he understood and still wished to plead guilty. Inman then admitted his guilt and expressed satisfaction with his defense counsel. Subsequently, Solicitor Robert M. Ariail (the Solicitor) presented a factual basis for the charged offenses that consisted of a stipulated summary of the facts.

When the judge resumed questioning Inman, he again inquired whether Inman understood that by pleading guilty he was waiving his right to have a jury sentence him for the murder conviction. Inman responded in the affirmative. Defense counsel, however, reiterated that Inman should not have to waive the right to have a jury determine his sentence. He emphasized that he "just want[ed] to make sure [the issue] is preserved."

In response, the judge again explained to Inman that he could not accept a "conditional guilty plea." The judge also instructed that he could not determine whether the jury sentencing issue was preserved for appellate review as it was a decision for the South Carolina Supreme Court. Inman indicated that he understood the judge's explanation and expressed his desire to continue the plea proceeding. The judge accepted Inman's plea and instructed that the sentencing proceeding would be held on September 8, 2008.

The Solicitor then expressed his concern that defense counsel's statements about the preservation of an appellate issue effectively made the plea conditional. Defense counsel disput-

ed the conditional nature of the plea, but assured Inman that the "issue is preserved and will survive the guilty plea."

Based on this exchange, the judge debated whether to accept Inman's plea, but ultimately asked Inman whether his plea was "dependent" on the jury sentencing issue. After conferring with defense counsel, Inman acknowledged that his plea was not based on whether he would succeed on an issue raised on appeal. Inman stated, "I just want to enter the plea and get it over with, just go on from here with the sentencing phase."

At the conclusion of the plea colloquy, the judge accepted Inman's plea and found that it was freely, knowingly, voluntarily, and intelligently made.

## C.

On September 8, 2008, the judge commenced the non-jury sentencing proceeding. In presenting its case for statutory aggravating circumstances, the State called two of the law enforcement officers to whom Inman confessed to the charged crimes. Additionally, Dr. Eric Dean Christensen, the forensic pathologist who conducted the Victim's autopsy, certified the Victim's death was caused by "asphyxia due to ligature strangulation." He further testified that there was "extensive bruising" on the Victim's body, which he believed was consistent with a physical struggle and the Victim being restrained. He also found physical evidence that suggested "traumatic sexual relations."

In terms of Inman's criminal history, the State offered extensive evidence of Inman's prior convictions in Florida and North Carolina as well as evidence of two unadjudicated incidents that occurred after Inman was released from the Florida Department of Corrections on September 1, 2005.

Subsequently, defense counsel initiated the case for mitigation. As the defense's first expert witness, counsel called Dr. David Richard Price, a forensic psychologist/neuropsychologist and clinical psychologist, who interviewed Inman and reviewed records regarding Inman's family, his prior crimes, his terms of incarceration, and his mental health records.

Based on these records, Dr. Price concluded that Inman suffered from the following: major depressive disorder, recurrent type; major depressive disorder with psychotic features; bipolar disorder; psychorhythmic disorder; schizoid personality disorder; dissociative identity disorder; and sexual paraphilia. In making these diagnoses, Dr. Price took into account Inman's extensive psychiatric history and his childhood, which included "pretty significant" records indicating that Inman had been sexually abused, physically abused, grew up in a "very unstable environment," suffered with a mother who was schizophrenic and an alcoholic father, began using drugs at an early age, and was incarcerated at age seventeen. Dr. Price also testified that Inman had attempted suicide on seven occasions, six of which occurred while he was incarcerated. He further stated that Inman believed the death penalty was the appropriate punishment for the murder of the Victim. Ultimately, Dr. Price opined that Inman committed the crimes against the Victim while he was under the influence of a mental and emotional disturbance and that his capacity to conform his conduct to the requirements of the law was substantially impaired.

Defense counsel next called Dr. Marti Loring, a Georgia-licensed clinical social worker and board certified expert in traumatic stress who was employed at the Center for Mental Health and Human Development in Atlanta, Georgia. The defense offered Dr. Loring "as an expert in the field of trauma, abuse, forensic and therapeutic interviewing, and as a social historian in capital sentencing cases."

During *voir dire*, the Solicitor inquired whether Dr. Loring had "performed services under [her] licensed clinical social worker status" and whether she was licensed in South Carolina. Upon receiving Dr. Loring's response that she was not licensed in South Carolina, the Solicitor directed the judge's attention to section 40–63–200 of the South Carolina Code,[5] which deals with the unauthorized practice of social work within the State of South Carolina. The Solicitor also pointed

---

5. S.C.Code Ann. § 40–63–200(A) (2011) ("A person who practices or offers to practice as a social worker in this State in violation of this chapter or a regulation promulgated under this chapter ... is guilty of a misdemeanor and, upon conviction, must be fined not more than one thousand dollars or imprisoned for not more than one year, or both.").

out that the statute "carries both civil and criminal penalties for violation." Based on this statute, the Solicitor argued that Dr. Loring was "not qualified as an expert in this state to testify or to render those services until she gets licensed."

In response, defense counsel argued that Dr. Loring's Georgia license was sufficient to qualify her as an expert witness in Inman's case. Counsel objected to the Solicitor's questioning and characterized it as "an inappropriate attempt to intimidate the witness with the authority that this Solicitor has in this state to indict." Counsel added that the Solicitor had put Dr. Loring "in a position where she may need to assert her Fifth Amendment privilege not to incriminate herself by answering the questions that I would otherwise have propounded to her."

The judge overruled the Solicitor's objection as he believed the intent of the statute was "to prevent persons from opening offices to conduct treatment in this state," which was distinguishable from Dr. Loring being retained as an expert for the defense.

After the judge determined that Dr. Loring was qualified to testify, defense counsel argued that the Solicitor's attempt to intimidate Dr. Loring constituted a violation of Inman's due process rights to present his defense. The Solicitor disputed this allegation and stated he could grant Dr. Loring immunity from prosecution in Inman's case. However, he clarified that he was not authorized to grant immunity for the other South Carolina cases in which she had testified.

Dr. Loring then expressed her concern about testifying and was granted an opportunity to consult with Bill Godfrey, an attorney who was present in the courtroom. When court reconvened, Dr. Loring stated she felt "threatened as a witness" and, as a result, invoked her Fifth Amendment right against self-incrimination upon the advice of counsel. Despite assurances by the judge that she would be granted immunity in Inman's case and prior cases, Dr. Loring maintained that she would not testify as she believed she would be "in violation of a criminal statute [that] would affect [her] professional reputation in other cases and in other jurisdictions."

The judge then held in abeyance any motions regarding Dr. Loring's testimony and permitted defense counsel to call its remaining four witnesses in mitigation.

The next day, defense counsel moved for a mistrial based on the Solicitor's *voir dire* of Dr. Loring. Specifically, counsel characterized the Solicitor's actions as prosecutorial misconduct. As additional support for this motion, defense counsel referenced an earlier capital case where the Solicitor had confronted another defense witness with a potential violation of section 40–63–200 of the South Carolina Code. Counsel claimed that in both of these instances the Solicitor had violated the South Carolina Rules of Professional Conduct[6] and section 16–9–340 [7], which makes it a crime to intimidate a witness "by threat or force" or to "attempt to obstruct or impede the administration of justice in any court." Because counsel did not believe the actions of the Solicitor could be rectified, defense counsel moved for a mistrial as well as the recusal of the Solicitor's office in the case. In addition, defense counsel requested that the judge implement a sentence of life without parole as he claimed the Solicitor's conduct was "intentional."

In response, the Solicitor contended that he had neither threatened Dr. Loring nor moved to indict her "even though, theoretically, she would have violated the statute from a prior case."

At the conclusion of these arguments, counsel for Dr. Loring informed the court that Dr. Loring would not testify and intended to invoke her Fifth Amendment privilege against self-incrimination.

The judge did not rule on the mistrial motion, but instead granted a continuance in order for defense counsel to retain another social historian. The judge, however, added that he "wouldn't rule that Dr. Loring [was] completely out of the case."

Seven months later, the judge held a hearing on April 14, 2009 to consider whether Dr. Loring should be released as a witness given the defense did not intend to call her and had retained another social historian. In his motion, counsel for Dr. Loring objected to the State's out-of-state witness subpoena of Dr. Loring as a necessary and material witness. At the

---

**6.** South Carolina Rules of Professional Conduct, Rule 407, SCACR.

**7.** S.C.Code Ann. § 16–9–340 (2003).

conclusion of the hearing, the judge declined to withdraw his certification of the subpoena [8] and stated that the case would proceed the following week.

On April 15, 2009, a Superior Court in Atlanta, Georgia signed an order directing Dr. Loring to attend a hearing the next day at 3:00 p.m. to determine her material witness status in South Carolina. Because Dr. Loring was at work when the order was left at her residence on the morning of April 16, 2009, she did not appear at the hearing. Later that night, officers attempted to serve a warrant for her arrest. After Dr. Loring's counsel contacted the South Carolina plea judge regarding the Georgia matter, the judge intervened and persuaded the District Attorney's Office in Atlanta to "table" the warrant based on the assurance that Dr. Loring would appear at the Pickens County Courthouse on April 20, 2009.

On April 20–22, 2009, the judge reconvened the sentencing proceedings. At the beginning of the hearing, Dr. Loring's counsel recounted the events in Georgia and argued that this constituted additional evidence of the Solicitor's attempt to intimidate Dr. Loring. As a result, he moved to have Dr. Loring immediately released as a witness in Inman's case.

Defense counsel concurred in these arguments and stated that the "sequence of events in Georgia would go directly to the motion for prosecutorial misconduct and the mistrial that we requested orally on September 11, 2008."

In response, the Solicitor denied any involvement in the Georgia events and claimed it was "every bit the fault of Dr. Loring, under the Georgia system." To counter this statement, defense counsel called Dr. Loring as a witness to testify for the limited purpose of documenting what transpired in Georgia. Although Dr. Loring came prepared to testify as a mitigation expert, she could not "assure [the court] a hundred percent that going through all this would not have an impact on [her]."

Following Dr. Loring's testimony, defense counsel renewed its motion for the "recusal of the Thirteenth Circuit Solicitor's Office." Counsel contended the Solicitor's actions were inten-

---

8. On April 1, 2009, the judge granted the Solicitor's petition to subpoena Dr. Loring as a material witness.

tional in that he knew the elimination of Dr. Loring's testimony would significantly impact Inman's case. In support of this contention, defense counsel offered testimonial and documentary evidence that the Solicitor's office had been involved in a similar incident wherein the Solicitor questioned a defense expert, during the sentencing portion of a capital case, regarding a potential violation of the South Carolina psychologist licensing statutes. In that case, however, the defense withdrew the motion apparently in exchange for the State withdrawing its notice to seek the death penalty.[9]

Additionally, defense counsel offered evidence of two other capital cases, one in 2006 [10] and another in 2007 [11], where Dr. Loring testified as an expert witness in the defense's case for mitigation. The Solicitor did not challenge Dr. Loring's qualifications in either of these cases.

Defense counsel then sought to recuse the Solicitor's office as advocates and call certain members as witnesses in order to establish the defense's claim of intentional prosecutorial misconduct.

After the judge denied this motion, defense counsel called attorney Desa Ballard as an expert in the field of legal ethics and professional responsibility in South Carolina. Based on her assessment of the Solicitor's conduct, Ballard opined that

9. Because the defense withdrew its motion, prosecutorial misconduct based on witness intimidation was not an issue on appeal. *State v. Laney*, 367 S.C. 639, 627 S.E.2d 726 (2006). However, the pertinent portions of the *Laney* trial transcript and defense motions reveal the Solicitor employed an identical tactic to that used against Dr. Loring in questioning defense counsel's expert witness, Dr. Everington, with respect to the lack of a South Carolina psychologist license.

10. In *State v. David Edens and Jennifer Holloway*, a 2006 capital trial, Dr. Loring testified as a social historian without any objection from the Solicitor as to her qualifications or lack of a South Carolina license to practice social work. During the jury deliberations, the jurors requested to listen to Dr. Loring's trial testimony. Because the jury could not reach a unanimous verdict as to the death penalty, the defendants were sentenced to life without the possibility of parole. Weeks after the verdict, the Solicitor requested to meet with the jurors over dinner to discuss the verdict. One juror, who attended the dinner, testified the Solicitor appeared upset with the LWOP verdict and wanted an explanation as to why the jurors had not voted for a death sentence.

11. *State v. Motts*, 391 S.C. 635, 707 S.E.2d 804 (2011).

the Solicitor had violated "a number of rules of professional responsibility in connection with his examination of Dr. Loring, which occurred in September of 2008." In view of the prior allegation of prosecutorial misconduct, Ballard believed the Solicitor was clearly aware that questioning Dr. Loring regarding the potential licensing violation was "improper" and constituted intimidation of a witness.

Defense counsel then declined to call Dr. Loring as witness. Instead, counsel renewed its motion for a mistrial based on prosecutorial misconduct. Counsel reiterated that he wished to call the Solicitor and members of his office as witnesses because he believed the testimony was relevant to the motion. In terms of relief, counsel sought a mistrial and, in turn, the imposition of a life without parole sentence as the Solicitor's deliberate misconduct precipitated the mistrial motion and, thus, implicated double jeopardy.

The judge denied each of defense counsel's motions. In so ruling, the judge initially rejected counsel's argument regarding double jeopardy as the judge found the Solicitor had not "deliberately goaded" the defense into requesting a mistrial. As to the merits of the mistrial motion, the judge concluded the Solicitor's questioning of Dr. Loring was inappropriate and constituted prosecutorial misconduct. However, the judge declined to grant a mistrial as he found the evidence did not support a finding of "deliberate" prosecutorial misconduct. Additionally, the judge concluded that Inman had not been prejudiced as the misconduct occurred during a bench trial as opposed to a jury trial and Dr. Loring had voluntarily appeared at the hearing and was willing to testify.

Immediately thereafter, defense counsel moved for a continuance in order to prepare the mitigation evidence as he had not been in contact with Dr. Loring since the September 2008 hearing and his recently-retained social historian had not completed her research and was not prepared to testify. The judge implicitly denied this motion.

Over defense counsel's objections, the judge called and questioned Dr. Loring as a "court witness." Dr. Loring testified she compiled a social history about the life and family of Inman by interviewing Inman and members of his family as well as reviewing Inman's medical history, school records, and

prison records. Relying on these records and interviews, Dr. Loring chronicled in detail the physical and sexual abuse that Inman endured during his childhood. She further testified as to Inman's use of drugs at an early age, his diagnosed mental illness, his suicide attempts, and his criminal history.

Throughout the questioning, defense counsel repeatedly sought to limit the testimony of Dr. Loring as counsel believed her opinions implicated attorney-work product as they had been previously discussed amongst the defense team.

After hearing closing arguments and Inman's personal statement, the judge sentenced Inman to death for murder and imposed two consecutive thirty-year sentences for first-degree burglary and first-degree criminal sexual conduct. In reaching this decision, the judge explained in both his oral and written order that the State had proven beyond a reasonable doubt three statutory aggravating circumstances to warrant the death penalty.[12] Specifically, the judge found that Inman murdered the Victim while in the commission of kidnapping, first-degree burglary, and first-degree criminal sexual conduct.

In terms of mitigating factors, the judge found Inman committed the murder while under the influence of mental or emotional disturbances[13] as there was evidence that Inman suffered from long-term mental health disorders. Despite these mental health disorders, the judge emphasized that these disorders did not excuse Inman from criminal responsibility for his actions involving the Victim.

Following the denial of his motion to reconsider and for a new trial, Inman appealed his plea of guilty and his sentence of death.

## II. Discussion

### A. Validity of Guilty Plea

Inman asserts his guilty plea to murder should be vacated on the ground it constituted an invalid conditional guilty plea.

---

12. S.C.Code Ann. § 16–3–20(C)(a)(1)(a), (b), (d) (2003 & Supp.2010) (listing statutory aggravating circumstances that warrant a sentence of death).

13. *Id.* § 16–3–20(C)(b)(2), (6) (listing mitigating circumstances to be considered in capital sentencing proceedings).

In support of this assertion, Inman directs this Court's attention to the portion of the plea colloquy where the judge expressed his opinion that the preservation of the jury sentencing issue was a decision for the Supreme Court. Inman characterizes the judge's statements as erroneous "speculations about appealability." Based on these statements and defense counsel's insistence that the issue was preserved for appeal, Inman claims the judge had a duty to reject the plea as it was conditional.

 "In South Carolina, guilty pleas must be unconditional." *State v. Downs*, 361 S.C. 141, 145, 604 S.E.2d 377, 379 (2004). "[I]f an accused attempts to attach any condition or qualification thereto, the trial court should direct a plea of not guilty." *State v. Truesdale*, 278 S.C. 368, 370, 296 S.E.2d 528, 529 (1982). "If the trial court accepts a conditional guilty plea, then the plea will be vacated on appeal." *Downs*, 361 S.C. at 145, 604 S.E.2d at 379. "The basis for this rule is, of course, the settled doctrine that a guilty plea constitutes *waiver* of all prior claims of constitutional rights or deprivations thereof." *Truesdale*, 278 S.C. at 370, 296 S.E.2d at 529.

██ Turning to the facts of the instant case, we find that Inman's guilty plea was unconditional. Significantly, Inman never attempted to reserve the right to challenge or deny the merits of his guilt. Any condition that he sought to attach to the plea involved an appellate challenge to section 16–3–20(B), which mandates that a judge rather than a jury determine sentencing in a capital case if the defendant enters a guilty plea. Under the mandatory appeal procedures in capital cases,[14] Inman was permitted to appeal this secondary sentencing issue; however, any decision as to this issue did not affect the entry or validity of his plea. Cf. *Downs*, 361 S.C. at 145–46, 604 S.E.2d at 379–80 (concluding appellant's capital guilty plea was unconditional where he never attempted to reserve the right to later deny his guilt, but instead sought to reserve the right to present evidence that he committed the

---

14. See S.C.Code Ann. § 16–3–25(A) (2003) ("Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of South Carolina.").

crime while mentally ill, an issue that involved post-sentencing treatment).

Furthermore, even if Inman preserved his challenge to section 16–3–20(B), he specifically abandoned this issue on appeal as he correctly recognizes that this issue has been decided against his position. See *State v. Allen,* 386 S.C. 93, 687 S.E.2d 21 (2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 3329, 176 L.Ed.2d 1229 (2010) (noting, in appeal of guilty plea and capital sentence, South Carolina precedent finding that section 16–3–20 does not violate the Sixth Amendment to the United States Constitution and concluding that it also did not violate the Eighth and Fourteenth Amendments; noting that the statute requires the sentencing judge to consider any mitigating circumstances allowed by law and that a defendant is not precluded from offering evidence of his remorse and acceptance of responsibility); *State v. Crisp,* 362 S.C. 412, 608 S.E.2d 429 (2005) (adhering to *Downs* and rejecting claims that section 16–3–20(B) was unconstitutional); *State v. Wood,* 362 S.C. 135, 607 S.E.2d 57 (2004) (citing *Downs* and concluding section 16–3–20(B) was constitutional); *Downs,* 361 S.C. at 146, 604 S.E.2d at 380 (discussing constitutionality of section 16–3–20(B) and finding capital defendant who pleaded guilty waived his right to jury trial on both guilt and sentencing).

Finally, a review of the plea colloquy reveals Inman entered his plea knowingly and voluntarily as he repeatedly acknowledged that he understood the charges against him, the consequences of his plea, and the rights he was waiving by pleading guilty, including the right to have a jury determine his guilt and sentence. Accordingly, we conclude Inman's plea was valid. See *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) ("The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " (quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970))); *Roddy v. State,* 339 S.C. 29, 33, 528 S.E.2d 418, 421 (2000) ("To find a guilty plea is voluntarily and knowingly entered into, the record must establish the defendant had a full understanding of the consequences of his plea and the charges against him.").

## B. Sentencing Proceedings

Having found that Inman's guilty plea was valid, we must next assess Inman's issues arising out of the sentencing proceedings.

### 1. Recusal of Solicitor's Office/Questioning Solicitor as a Defense Witness

Inman claims the judge abused his discretion by declining to recuse the Solicitor's office as advocates [15] and refusing to allow defense counsel to question the Solicitor and members of his staff on the claim of intentional prosecutorial misconduct.

"[A] criminal defendant has a right to call the prosecuting attorney as a witness, subject to the trial court's usual discretion to exclude witnesses or evidence." *State v. Quattlebaum*, 338 S.C. 441, 453, 527 S.E.2d 105, 111 (2000) (citing *State v. Lee*, 203 S.C. 536, 28 S.E.2d 402 (1943)). In *Quattlebaum*, this Court emphasized that "litigants, and especially defendants in criminal cases, should not be hampered in their choice of those by whom they choose to prove their cases." Id. However, a defendant's right to call a prosecuting attorney as a witness is not without limitation as this Court has stated:

Although a prosecuting attorney is competent to testify, his testifying is not approved by the Courts *except* where it is made necessary by the circumstances of the case, and, if he knows before the trial that he will be a necessary witness, he should withdraw and have other counsel prosecute the case. The propriety of allowing the prosecutor to testify is a matter largely within the trial Court's discretion.

*Lee*, 203 S.C. at 540, 28 S.E.2d at 403 (emphasis added). Other jurisdictions have agreed with this Court's limitation on a prosecutor as a defense witness and have further clarified that the testimony "must be relevant and material to the theory of the defense . . . [and] it must not be privileged,

---

15. As we interpret Inman's trial and appellate arguments, we believe Inman is challenging the judge's failure to recuse the Solicitor's office in two contexts: (1) as advocates so that defense counsel could question the Solicitor and members of his staff regarding the claim of prosecutorial misconduct, and (2) as to the entire case due to the finding of prosecutorial misconduct. Accordingly, in the interest of logical progression, we have addressed these two claims separately.

repetitious, or cumulative." *Johnson v. State,* 23 Md.App. 131, 326 A.2d 38, 45 (Md.Ct.Spec.App.1974) (citing *State v. Lee,* 203 S.C. 536, 28 S.E.2d 402 (1943)), aff'd, 275 Md. 291, 339 A.2d 289 (1975).

It is evident that this Court and courts from other jurisdictions disfavor defense counsel calling a prosecuting attorney to testify in a case in which he is participating as an advocate. See *Bennett v. Commonwealth,* 236 Va. 448, 374 S.E.2d 303, 313 (1988) ("[I]t is not desirable for the Commonwealth's Attorney to testify as a witness on a material point in a case. The circumstances are rare indeed where any lawyer may properly testify in a case in which he is participating as an advocate."); *see also* Erwin S. Barbre, Annotation, *Prosecuting Attorney as A Witness in Criminal Case,* 54 A.L.R.3d 100 (1973 & Supp.2011) (analyzing cases where the propriety of a prosecuting attorney's testifying in a criminal case on behalf of the prosecution or on behalf of the defendant was at issue; recognizing that such a decision is dependent upon the facts of the case, is discretionary, and generally does not require the prosecutor to withdraw or be recused from the case when called on behalf of the defendant).

However, even if a prosecutor is called as a witness by the defense, it is not always necessary for a trial judge to recuse the prosecutor or the prosecuting office in its entirety. In fact, "[t]here is no inherent right to disqualification when a member of the state attorney's office is called as a witness in a case prosecuted by a state attorney in the same office, unless actual prejudice can be shown." 81 Am.Jur.2d *Witnesses* § 229 (2004 & Supp.2011); *People v. Superior Court of San Luis Obispo,* 84 Cal.App.3d 491, 148 Cal.Rptr. 704, 710 (Cal. Ct.App. 5th Dist.1978) ("The general rule is that a district attorney's office should not be recused from a case merely because one or more of its attorneys will be called as witnesses for the defense.").

Applying the foregoing to the facts of the instant case, we find the judge did not abuse his discretion in refusing to recuse the Solicitor's office as advocates and declining defense counsel's request to question the Solicitor.

Initially, we note that the judge's determination of prosecutorial misconduct did not necessitate the recusal of the entire

Solicitor's office as this allegation primarily involved the Solicitor. See *State v. Doran*, 105 N.M. 300, 731 P.2d 1344 (N.M.Ct.App.1986) (finding no merit to defendant's contention that entire staff of district attorney's office should have been disqualified where prosecutor testified at pretrial suppression hearing that was conducted by another assistant district attorney).

Furthermore, defense counsel's primary reason for calling the Solicitor as a witness was to establish that he intentionally committed misconduct. Because a determination of prosecutorial misconduct is not necessarily dependent upon the intent of the prosecutor, such testimony was neither relevant nor material to the defense's claim. See *People v. Hill*, 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673, 683–84 (1998) (discussing concept of prosecutorial misconduct and stating "injury to appellant is nonetheless an injury because it was committed inadvertently rather than intentionally"; recognizing that the term "prosecutorial misconduct" is a misnomer to the extent it "suggests a prosecutor must act with a culpable state of mind"); *Diggs v. State*, 531 N.E.2d 461, 464 (Ind.1988) ("A prosecutor's warning of criminal charges during a personal interview with a witness improperly denies the defendant the use of that witness's testimony regardless of the prosecutor's good intentions."). We emphasize that a determination of a prosecutor's intent is applicable where the prosecutor intentionally goads the defense into moving for a mistrial [16] or the prosecutor's actions implicate the attorney-client relationship.[17] Neither of these situations is present in the instant case.

---

16. See *State v. Parker*, 391 S.C. 606, 612, 707 S.E.2d 799, 802 (2011) (stating that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion" (quoting *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982))).

17. Citing *Quattlebaum*, Inman claims that "*deliberate* prosecutorial misconduct raises an irrebuttable presumption of prejudice" and, thus, the determination of "intent" is necessary to establish prosecutorial misconduct. *Quattlebaum*, 338 S.C. at 448, 527 S.E.2d at 109. We clarify that this statement in *Quattlebaum* is limited to a situation where the prosecutorial misconduct implicates a criminal defendant's attorney-client relationship and does not apply to all cases of prosecutorial

Finally, any testimony from the Solicitor or members of his staff would have been cumulative as defense counsel submitted significant testimonial and documentary evidence regarding the Solicitor's use of this tactic in prior capital cases. Specifically, defense counsel cited the *Laney* case and offered evidence in the form of a trial transcript and testimony from the Public Defender that established the Solicitor employed a line of questioning as used against Dr. Loring to a defense expert regarding a potential violation of the South Carolina psychologist licensing statutes. Defense counsel also offered evidence that the Solicitor, in two capital trials that preceded Inman's case, did not challenge Dr. Loring's lack of a South Carolina license to practice social work. Based on this evidence, defense counsel was able to support its theory that the Solicitor knew the line of questioning was objectionable and only employed it in Inman's case after he realized that jurors in the *Edens/Holloway* case relied heavily on Dr. Loring's testimony in sentencing the defendants to LWOP rather than death.

In view of the foregoing, we find the judge did not abuse his discretion in declining to recuse the Solicitor's office and refusing to permit defense counsel to call the Solicitor and members of his staff as witnesses. See *Lee*, 203 S.C. at 542, 28 S.E.2d at 404 (concluding trial judge did not err in refusing to allow defense counsel to call solicitor as witness where testimony would have been merely cumulative); *see also Cooper v. State*, 847 S.W.2d 521 (Tenn.Crim.App.1992) (holding trial court did not err in refusing to allow defendant to call district attorney general and assistant attorney general as witnesses on issue of State's abuse of discretion in pursuing death penalty where defendant did not allege facts to show how his constitutional rights were violated); *Bennett v. Com-*

misconduct as we held in *Williams* that prosecutorial misconduct involving witness intimidation required a defendant to demonstrate "both substantial interference and prejudice." *State v. Williams*, 326 S.C. 130, 135, 485 S.E.2d 99, 102 (1997). Recently, we implicitly recognized the limited nature of our holding in *Quattlebaum*. See *State v. Morris*, 376 S.C. 189, 200, 656 S.E.2d 359, 365 (2008) (finding the "irrebuttable presumption of prejudice" found in *Quattlebaum* was inapplicable where Appellant had not shown prosecutorial misconduct and had not demonstrated his prosecution was unconstitutional, improper, or that the government pursued a civil action or investigation solely to obtain evidence for a criminal prosecution).

*monwealth,* 236 Va. 448, 374 S.E.2d 303 (1988) (concluding trial court did not abuse its discretion in denying defendant's request to question Commonwealth's attorney on witness stand concerning reasons for which continuance had been granted and concerning possible violations of court order).

## 2. Witness Intimidation

Having found the judge did not abuse his discretion in refusing to recuse the Solicitor's office as advocates and declining to permit defense counsel to question the Solicitor and members of his staff, we must determine whether the Solicitor's *voir dire* of Dr. Loring constituted witness intimidation and, in turn, prosecutorial misconduct.

Inman asserts the judge erred in refusing to grant a mistrial and recuse the Solicitor's office from any further involvement in the case despite a finding of prosecutorial misconduct arising out of the Solicitor's intimidation of Dr. Loring using "baseless criminal prosecution" and the subpoena of Dr. Loring as a State's witness.

In contrast, the State claims the judge properly denied the motion for a mistrial and recusal of the Solicitor's office. In support of this claim, the State argues that there was no misconduct as the *voir dire* was appropriate based on the applicable South Carolina licensing statute. However, even if the Solicitor committed misconduct, the State contends it was not prejudicial to Inman as the Solicitor granted Dr. Loring immunity from prosecution and she voluntarily testified during the sentencing hearing.

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). "This right is a fundamental element of due process of law." Id.

As this Court has recognized, the constitutional right of a defendant to call witnesses requires that they be called without intimidation from the State. *State v. Williams,* 326 S.C. 130, 485 S.E.2d 99 (1997). In *Williams,* this Court explained:

"Improper intimidation of a witness may violate a defendant's due process right to present his defense witnesses freely if the intimidation amounts to 'substantial government interference with a defense witness' free and unhampered choice to testify.'" ... Where substantial interference is found, the next issue is whether the error can be deemed harmless. *United States v. Saunders, supra* [943 F.2d 388 (1991)]. The rule in the Fourth Circuit appears to be that governmental intimidation can be deemed harmless error where the witness nonetheless testifies. Compare *United States v. Teague*, 737 F.2d 378 (4th Cir.1984) (harmless where defendant was not denied either all or the helpful part of the witness' testimony as a result of the attempted intimidation) with *United States v. MacCloskey*, 682 F.2d 468 (4th Cir.1982). Under this rule, the intimidation in this case could not be deemed harmless. We decline, however, to adopt such an automatic reversal rule and hold that in order to obtain relief, a defendant must demonstrate both substantial interference and prejudice.

Id. at 135, 485 S.E.2d at 102. However, even if the defendant demonstrates substantial interference and prejudice, a new trial is not always the requisite remedy. Instead, "[t]he remedy to be afforded a defendant in this situation is determined by the facts and circumstances of each case, depending on the prejudice suffered by the defendant." Id. at 136, 485 S.E.2d at 103.

■ In analyzing a claim of prosecutorial misconduct based on alleged witness intimidation, this Court has acknowledged the prosecutor's "fundamental power" to "bring charges against a person the prosecutor believes has committed a crime." *State v. Needs*, 333 S.C. 134, 145, 508 S.E.2d 857, 862 (1998). This power is, nevertheless, subject to "constitutional constraints." Id. For example, a prosecutor may not "lob baseless threats or charges at a potential defense witness in an effort to prevent the witness from testifying." Id. at 146, 508 S.E.2d at 863; see Lisa A. Wenger, Annotation, *Admonitions Against Perjury or Threats to Prosecute Potential Defense Witness, Inducing Refusal to Testify, As Prejudicial Error*, 88 A.L.R.4th 388 (1991 & Supp.2011) (analyzing state and federal cases where prosecutor informs defense witness

that that witness could face perjury charges or other prosecution if the witness testified).

 We find the Solicitor's conduct toward Dr. Loring unequivocally constituted witness intimidation. Even if the Solicitor was legitimately concerned about Dr. Loring's qualifications as an expert witness, he could have filed a motion to disqualify her, which could have been addressed in a pre-trial hearing without the presence of Dr. Loring. By challenging Dr. Loring as soon as she took the stand, the Solicitor's method of questioning can only be viewed as an intimidation tactic. The Solicitor's claimed grant of immunity to Dr. Loring did not negate the atmosphere of intimidation as Dr. Loring repeatedly testified that she felt threatened.

Secondly, based on the testimonial and documentary evidence the defense presented on this issue, it is clear the Solicitor knew this line of questioning was objectionable as it had formed the basis of a previous allegation of prosecutorial misconduct in the *Laney* case.

Furthermore, at the time of the September 2008 sentencing hearing, the Solicitor was on notice from this Court that an out-of-state expert witness's failure to comply with South Carolina licensing requirements did not preclude the witness from testifying. In fact, the Court had specifically held on February 25, 2008 that the lack of a South Carolina professional license was merely a factor for the judge to consider as to the witness's qualifications as an expert. *Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 658 S.E.2d 80 (2008) (discussing *Baggerly* and finding trial judge erred in disqualifying expert witness on the basis that witness failed to comply with South Carolina's home inspection licensing requirements, but concluding the error was harmless); see *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 635 S.E.2d 97 (2006) (recognizing conflict between Rule 702, SCRE's qualification for experts and a statute that defined the practice of engineering to include the offering of expert technical testimony; holding non-compliance with licensing requirements or with statutory law in specialized areas does not require trial judge to automatically refuse to qualify a witness as an expert); *see also RE: Act No. 385 of 2006–relating to defining the "practice of medicine"*, S.C. Sup.Ct. Order dated Aug. 24,

2006 (staying the application of amendment to section 40–47–20(36) of the South Carolina Code and, in turn, permitting out-of-state physicians to offer testimony without seeking a South Carolina medical license before offering the testimony). Despite this Court's clear directive, the Solicitor combatively challenged Dr. Loring's lack of a South Carolina social worker license.

Finally, the Solicitor's decision to subpoena Dr. Loring as a witness, after the defense severed its ties with her, provides additional evidence of witness intimidation. Although the judge granted the State's petition to certify Dr. Loring as a material witness, the method of procuring her appearance at the sentencing hearing supports Inman's claim of witness intimidation. We believe it was disingenuous for the Solicitor to assert that there was no wrongdoing on the part of the State regarding the events that took place in Georgia. Based on Dr. Loring's testimony, it was clear that she was not attempting to abscond from Georgia and purposefully decline to appear at the sentencing hearing. Thus, we find the Solicitor's initiation of the events in Georgia went beyond a necessary course of action. See *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ("[A prosecutor] may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."), *overruled on other grounds by Stirone v. U.S.*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

Based on the foregoing, we find there is evidence to support the judge's finding of prosecutorial misconduct as the Solicitor's actions were done for no other purpose than to intimidate Dr. Loring.[18]

---

18. We will not tolerate witness intimidation from anyone, including the Solicitor's office. Furthermore, we are deeply concerned that the Solicitor's behavior represents a pattern of misconduct that continues to undermine our state's system of justice. Specifically, this Court is concerned with the "win at all costs" attitude that appears to permeate the Solicitor's office. Because the plea judge determined that the Solicitor's conduct was not intentional, we reluctantly defer to that

### 3. Mistrial

 Having concluded that the Solicitor's actions constituted prosecutorial misconduct, the question becomes whether a mistrial was warranted.

 "The prejudicial effect of prosecutorial misconduct is determined by (1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the court." *United States v. Anwar,* 428 F.3d 1102, 1112 (8th Cir.2005) (citations omitted).

 The decision to grant or deny a mistrial is within the sound discretion of the trial court and will not be overturned on appeal absent an abuse of discretion amounting to an error of law. *State v. Cooper,* 334 S.C. 540, 551, 514 S.E.2d 584, 590 (1999). The granting of a motion for a mistrial is an extreme measure that should be taken only when the incident is so grievous the prejudicial effect can be removed in no other way. *State v. Beckham,* 334 S.C. 302, 310, 513 S.E.2d 606, 610 (1999).

As will be discussed, we find the judge correctly denied defense counsel's motion for a mistrial trial as Inman has not established prejudice sufficient to warrant such a severe remedy.

 First, any assessment of prejudice to Inman must be viewed from the posture of a bench trial as opposed to a jury trial. It is well-established that it is a near insurmountable burden for a defendant to prove prejudice in the context of a bench trial as a judge is presumed to disregard prejudicial or inadmissible evidence. See *Cole v. Commonwealth,* 16 Va. App. 113, 428 S.E.2d 303, 305 (1993) ("A judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments and to separate, during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both. Consequently, we presume that a trial judge disregards prejudicial or inadmissible evidence." (citations omitted)); *see*

---

factual finding. However, we note that in the future such misconduct may result in disciplinary proceedings.

*also People v. Jackson,* 409 Ill.App.3d 631, 350 Ill.Dec. 727, 949 N.E.2d 215, 229 (2011) ("In a bench trial, the danger of prejudice due to the trial judge's questions to a witness is lessened.").

Here, the judge correctly considered that Dr. Loring did not have a South Carolina social worker's license merely as a factor in her qualifications as an expert witness. Having found Dr. Loring qualified as an expert witness, the judge properly called and questioned her as a court's witness. Because Dr. Loring testified, Inman cannot claim he was prejudiced as his counsel declined the opportunity to question Dr. Loring. *Williams,* 326 S.C. at 135, 485 S.E.2d at 102 (recognizing that governmental intimidation of a witness can be deemed harmless error where the witness nonetheless testifies).

Furthermore, any testimony that was potentially excluded was arguably cumulative to that of Dr. Price, who testified in detail regarding Inman's childhood, his family, his mental health disorders, and his criminal history. Finally, a review of the judge's oral and written orders establishes that he thoroughly considered all mitigating evidence.

Although we find the Solicitor committed prosecutorial misconduct, we conclude Inman's sentence of death was not imposed in violation of his due process rights. See 16C C.J.S. *Constitutional Law* § 1644 (Supp.2011) ("The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor."). Accordingly, we find the judge did not abuse his discretion in declining to grant a mistrial.[19]

### III. Proportionality Review

■ Based on our decision to affirm Inman's guilty plea and the judge's rulings regarding the sentencing proceedings, we must assess Inman's sentence of death as it is this Court's duty to conduct a proportionality review of Inman's death sentence. S.C.Code Ann. § 16–3–25(C) (2003).[20]

---

**19.** In light of our decision, we need not address Inman's related issue that the Solicitor's office should have been recused due to a finding of prosecutorial misconduct.

**20.** See S.C.Code Ann. § 16–3–25(C) (2003) (providing that Supreme Court shall determine whether: (1) the sentence of death was imposed

■■■■■■ "The United States Constitution prohibits the imposition of the death penalty when it is either excessive or disproportionate in light of the crime and the defendant." *State v. Wise,* 359 S.C. 14, 28, 596 S.E.2d 475, 482 (2004). In conducting a proportionality review, we search for similar cases in which the sentence of death has been upheld. Id.; S.C.Code Ann. § 16-3-25(E) (2003) (providing that in conducting a sentence review the Supreme Court "shall include in its decision a reference to those similar cases which it took into consideration").

After reviewing the entire record, we conclude the sentence of death was not the result of passion, prejudice, or any other arbitrary factor, and the judge's finding of three statutory aggravating circumstances for the murder is supported by the evidence. In its case, the State presented evidence of Inman's confessions, which detailed the events of the Victim's murder, as well as testimony from the forensic pathologist that confirmed Inman committed the murder while in the commission of kidnapping, first-degree criminal sexual conduct, and first-degree burglary.

Furthermore, a review of prior cases establishes that the death sentence in this case is proportionate to that in similar cases and is neither excessive nor disproportionate to the crime. See *State v. Stanko,* 376 S.C. 571, 658 S.E.2d 94 (2008) (death sentence warranted where defendant was convicted of murder, ABWIK, criminal sexual conduct, kidnapping, and armed robbery); *State v. Evins,* 373 S.C. 404, 645 S.E.2d 904 (2007) (death sentence warranted where defendant was convicted of murder, kidnapping, first-degree criminal sexual conduct, and grand larceny); *State v. Simmons,* 360 S.C. 33, 599 S.E.2d 448 (2004) (death sentence upheld where jury found aggravating circumstances of criminal sexual conduct, kidnapping, armed robbery, physical torture, and burglary); *State v. Whipple,* 324 S.C. 43, 476 S.E.2d 683 (1996) (death sentence upheld where defendant was convicted of murder,

under the influence of passion, prejudice, or any other arbitrary factor; (2) the evidence supports the jury's or judge's finding of a statutory aggravating circumstance; and (3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant).

criminal sexual conduct, armed robbery, and grand larceny of a motor vehicle).

## IV. Conclusion

In conclusion, we hold Inman entered a valid guilty plea as the entry of the plea was not conditioned on the preservation or outcome of the jury sentencing issue. Moreover, even if Inman properly preserved this issue, he has abandoned it on appeal and this Court has repeatedly rejected his argument. As to the propriety of the sentencing proceedings, we conclude the judge did not abuse his discretion in denying Inman's requests to recuse the Solicitor's office as advocates and to question members of the office. Although we find the Solicitor committed prosecutorial misconduct in his treatment of Dr. Loring, we conclude that Inman was not sufficiently prejudiced to warrant the grant of a mistrial.

**AFFIRMED.**

KITTREDGE, J., concurs.

PLEICONES, J., concurring in a separate opinion.

TOAL, C.J., and HEARN, J., concur in both opinions.

Justice PLEICONES.

I concur with the majority but write separately to elucidate my views of *State v. Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105 (2000), to the extent they differ from those expressed by the majority.

I agree with the majority that *Quattlebaum* should be limited to its facts. A one-size-fits-all solution is a poor response to prosecutorial misconduct. "The granting of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that prejudicial effect can be removed in no other way." *State v. Beckham*, 334 S.C. 302, 310, 513 S.E.2d 606, 610 (1999) (citing *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998)). As the United States Supreme Court has noted, interests beyond the supervision of prosecutorial behavior are implicated by a decision to grant a new trial. *United States v. Hasting*, 461 U.S. 499, 506–507, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). Although the

duty to curb prosecutorial misconduct is compelling, other weighty concerns are also at stake, including the need to conserve judicial resources and to avoid imposing additional burdens on victims. Id. at 509, 103 S.Ct. 1974. The *Hasting* Court rebuked the court below for failing to "consider the trauma the victims of these particularly heinous crimes would experience in a new trial, forcing them to relive harrowing experiences now long past, or the practical problems of retrying these sensitive issues more than four years after the events." Id. at 507, 103 S.Ct. 1974.

Even where constitutional protections are implicated, a new trial is called for only in situations where the defendant's right to a fair trial is fundamentally compromised. Id. at 509, 103 S.Ct. 1974 ("[T]he Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations."). This is so because "the aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Likewise, I believe that we should seek to avoid a rule unduly punishing the citizens of this State for the misdeeds of solicitors. A rule that turns on whether the misconduct was intentional would have such an effect in some cases. As the Court notes parenthetically, "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor" (citing 16C C.J.S. *Constitutional Law* § 1644 (Supp.2011)). Thus, fairness should be the touchstone of the inquiry, and only in a limited set of exceptional circumstances should prejudice be presumed.

Direct intrusion into and eavesdropping on the defendant's confidential communications with counsel, as occurred in *Quattlebaum*, is the sort of violation that is likely to taint the entire trial, making it fundamentally unfair. But this is an exception, not the general rule. As the majority clarifies, *Quattlebaum* did not overrule prior case law that, under different facts, mandates an inquiry into whether the prosecutorial misconduct resulted in prejudice before a new trial is granted.

With regard to witness intimidation, the established rule in this State is that "in order to obtain relief, a defendant must demonstrate both substantial interference and prejudice." *State v. Williams,* 326 S.C. 130, 135, 485 S.E.2d 99, 102 (1997). In the present case, there is no claim that any substantive mitigating testimony was lost. Indeed, there is no claim that any testimony was lost. The defendant's expert witness investigated appellant's social background and was able to testify to her opinions regarding it. Appellant claims only that the effectiveness of the expert's testimony on mitigating factors pertinent to sentencing was diminished by the solicitor's misconduct.

Even assuming that the effectiveness of the testimony was reduced by the solicitor's attempts to intimidate the witness, the testimony was given before a judge, not a jury. A judge is presumed to weigh evidence properly. See *Ross v. Jones,* 58 S.C. 1, 35 S.E. 402, 405–406 (1900). As the majority recognizes, the record shows that the sentencing judge was fully aware of the solicitor's conduct and related events surrounding the expert's testimony, even finding that it was prosecutorial misconduct. We must presume that he took them into account in considering the testimony.

The solicitor's conduct in this case was inexplicable and reprehensible. In light of the aggravated nature of the crime and the fact that the sentencing hearing took place before a judge, it is difficult to comprehend how the solicitor believed that intimidating an expert witness would be more likely to ensure a death sentence than to create a risk of reversal. See *United States v. Teague,* 737 F.2d 378, 382 (4th Cir.1984) (describing prosecutors' warnings to defense witnesses of the consequences of perjury as "dangerous and foolish ... because they can violate a defendant's due process right to present his defense witnesses freely" and thereby risk upsetting a guilty verdict). Despite the behavior of the solicitor, I would not ascribe a uniform "attitude" to the solicitor's office. I would limit myself to the facts appearing in the record, which do not implicate the entire office. Moreover, I cannot assume without more evidence that the solicitor was responsible for the manner in which Georgia authorities handled the matter. Whatever the appropriate response to the solicitor's conduct may be, it does not include reversal.

Thus, for the reasons set forth above, I concur in the judgment of the majority.

TOAL, C.J. and HEARN, J., concur.