# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Sidney Stclair Moorer, Appellant.

Appellate Case No. 2019-001636

―――――――――――

Appeal From Horry County
R. Markley Dennis, Jr., Circuit Court Judge

―――――――――――

Opinion No. 5988
Heard April 13, 2022 – Filed June 7, 2023

―――――――――――

## AFFIRMED

―――――――――――

Appellate Defender Taylor Davis Gilliam, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Senior Assistant Attorney General David A. Spencer, both of Columbia; and Solicitor Jimmy A. Richardson, II, of Conway, all for Respondent.

―――――――――――

**HILL, A.J.:** Sidney S. Moorer (Sidney) appeals his convictions for kidnapping and conspiracy to kidnap. Sidney argues the trial court erred in (1) transferring venue of his case back to Horry County; (2) denying his motion for directed verdict on both the kidnapping and conspiracy to kidnap charges; and (3) qualifying Grant Fredericks as an expert in forensic video analysis and allowing him to testify the Moorers' truck was the vehicle videotaped going toward and away from the place from which the victim disappeared. We affirm.

# I. BACKGROUND FACTS

From July 2013 until late October or early November 2013, Sidney, a thirty-eight-year-old man, had an affair with Heather Elvis (Victim), a nineteen-year-old woman. Sidney and Victim met at the Tilted Kilt, a restaurant at Broadway at the Beach in Myrtle Beach, where Victim worked as a hostess and Sidney did maintenance work. Victim and Sidney communicated with each other on their cell phones around 400 to 500 times a month until their relationship ended when Tammy Moorer (Tammy), Sidney's wife, found out about the affair. During the affair, Tammy's and Sidney's cell phone records showed they also regularly communicated, but from November 2, 2013, to December 18, 2013, communication between Tammy's and Sidney's cell phones stopped.

On the evening of December 17, 2013, Victim went on a first date with a man her age. During the date, Victim acted happy, and her date dropped Victim off at her apartment after 1:00 a.m. on December 18, 2013. Meanwhile, Sidney and Tammy were, by their own admission, together. Location data from their cell phones indicated they were in the area of Victim's apartment and the area of Longbeard's Bar, from 11:00 p.m. until 1:30 a.m. At 1:19 a.m., Sidney purchased a pregnancy test kit from Walmart. From Walmart, Sidney and Tammy traveled to a Kangaroo Express gas station and parked across the street. At 1:33 a.m., Sidney exited his truck and walked across the street to the gas station. At 1:35 a.m., he called Victim—for the first time since their affair ended six weeks before—from a payphone located outside the gas station. The call lasted four minutes and fifty seconds. Location data from Victim's phone showed she was in the area of her apartment when she received this call.

After receiving the payphone call, Victim called her roommate Brianna Warrelmann, who was out of town. Victim was upset and crying. Warrelmann calmed Victim down, told Victim not to meet with Sidney, and told Victim to go to sleep and they would talk in the morning. However, it appears Victim called the pay phone number two times from the area of her apartment, changed into her favorite outfit, and—according to the location data from her cell phone—left her apartment at 2:32 a.m. Victim called the payphone a third time while driving, and at 2:43 a.m., when she arrived in the same area that Sidney and Tammy had been just four hours earlier, she called the payphone another six times. None of the calls were answered.

Victim returned home, where, at 3:16 and 3:17 a.m., she called Sidney's cell phone twice. The first call to Sidney's cell phone went to voicemail, but the second call lasted a little over four minutes. Location data from Sidney's phone shows he was at or near his home when he spoke to Victim. Location data from Victim's phone

showed after this call, Victim left her apartment and went to Peachtree Landing (the Landing), which is located about a five-minute drive from the Moorers' home. While at the Landing, Victim called Sidney's cell phone four more times—at 3:38 a.m., 3:39 a.m., 3:40 a.m., and 3:41 a.m. All four calls went to voicemail. The 3:41 a.m. phone call was the last one made from Victim's phone, and to this date, there has been no further activity on Victim's phone. At 4:37 a.m., Tammy texted Sidney for the first time since November 2, 2013.

Victim's car was discovered at the Landing at 4:00 a.m. on December 18, 2013, by an officer on routine patrol, who noted no signs of a struggle at the Landing and nothing appeared to be wrong with the car. On the evening of December 19, 2013, when her car was still abandoned at the Landing, the police contacted Victim's father, and a search for Victim began. Victim has never been found.

Based on Victim's phone records, a search of her apartment, and discussion with her coworkers and roommate, it became apparent Victim may have been pregnant with Sidney's child,[1] and Sidney became the prime suspect in Victim's disappearance. On December 20, 2013, the police visited the Moorers' home. Tammy gave the police consent to enter the home and property, where they discovered the Moorers had a home surveillance system; a black 2013 Ford F-150 Ford Platinum truck that Tammy told them could not be unlocked at the time; and a bag of cement, a spent shotgun shell, and a bottle of cleaning fluid piled by the Moorers' parked camper. The day after this police visit, Sidney purchased a new home surveillance system. Video from this new surveillance system showed Sidney, Tammy, Tammy's sister, and Tammy's sister's boyfriend cleaning, pressure washing, and vacuuming the Moorers' Ford F-150 on December 22, 2013, and then burning the rags used to clean the car. Later in February 2014, officers searched the Moorers' home and their Ford F-150, finding no evidence of Victim's disappearance.

Investigators began looking into Sidney's life more closely and discovered Tammy may have also been involved in Victim's disappearance. Phone records and location data from the Moorers' two cell phones[2] and their computer revealed a grim picture

---

[1] Several of Victim's coworkers and Victim's roommate reported that after Victim and Sidney's relationship ended, Victim started to gain weight; believed she was pregnant; took a pregnancy test at work, receiving an error result; and discarded another pregnancy test box in the bathroom of her apartment that was found after her disappearance. The pregnancy test from this box was never found.

[2] The State's cell phone location data expert testified he tried to retrieve GPS data from Victim's and Sidney's Google history report. Victim's records supported the

of a wife who was irate with her husband for having an affair with a younger woman; who threatened Victim upon discovery of the affair[3]; who desired to punish Sidney by handcuffing him to the bed at night and having him get a tattoo of her name on his waistline; who took control of Sidney's cell phone on November 2, 2013, when she discovered the affair; who sexted other men from Sidney's cell phone; who drank excessively and smoked pot, even when she was allegedly pregnant or trying to become pregnant; and who went with her husband to work since discovering the affair.

In the course of their investigation, officers discovered two surveillance systems had captured an image of a pickup truck driving between the Moorers' home and the Landing in the early morning hours of December 18, 2013. One was a home surveillance system located five minutes from the Landing, which showed a dark color pickup truck heading towards the Landing at approximately 3:45 a.m. and then passing back about ten minutes later. The second was a business' surveillance system located two or three minutes from the Landing, which showed a dark pickup truck going towards the Landing at 3:39 a.m. and returning from the Landing at 3:46 a.m. The police asked a forensic video analysist, Grant Fredericks, to assist them in identifying the truck from these videos. After conducting many tests, including a "headlight spread pattern analysis," Fredericks formed the opinion the truck in the video footage was the Moorers' Ford F-150.

A Horry County Grand Jury indicted Sidney and Tammy for kidnapping and conspiracy to kidnap Victim. Sidney and Tammy were tried separately. Sidney's first trial, held in 2016, ended in a mistrial. This appeal is from his 2019 retrial.

At Sidney's retrial, the State presented evidence from police investigators; a

---

phone location data, but Sidney's data had been deleted and his account had been closed on December 25, 2013. Notably, Sidney's data and account was deleted after he spoke to a police officer on December 20, 2013, who asked Sidney if the police would discover he went to the Landing the night Victim disappeared by looking at his GPS records.

[3] On November 2, 2013, after Tammy discovered the affair, she called Victim's phone multiple times from her cell phone. Tammy also sent Victim several text messages from Sidney's cell phone, including "Who the f*** is this?" and "You want to call me right now and explain yourself? It would be wise thing to do. . . . Save yourself. I'm giving you one last chance to answer before we meet in person, only one. Hey, Sweetie, you ready to meet the Mrs., the kids want to meet you?" Victim's coworkers reported Victim was scared of Tammy.

cellphone location data analyst; Victim's coworkers, who testified Victim was a dependable worker; Victim's roommate; the man with whom Victim went on her December 17, 2013 date; witness testimony indicating the Moorers' personal surveillance system was likely functional on the night of December 18, 2013; and expert testimony that the SD card in the Moorers' Ford F-150's GPS and navigational system was removed at 12:07 a.m. on December 18, 2013, and a warning about the SD card's removal would have played on the truck's GPS monitor. The trial court also qualified Fredericks as an expert witness in forensic video analysis. Fredericks testified the truck seen in the surveillance videos driving to and from Peachtree Landing close to the time Victim disappeared was the Moorers' Ford F-150.

The State sought to paint the picture that in the weeks before Victim's disappearance, Tammy was infuriated with Sidney for having an affair with Victim; Sidney's phone was under Tammy's control; Tammy sought revenge on Sidney for the affair by sending sexual messages to other men on Sidney's phone; and upon hearing rumors that Victim was pregnant with Sidney's child, Sidney and Tammy sought to dispose of Victim and her unborn child to prevent Victim from forever having a hold on Sidney and ruining their family. The State's theory was that, on the night of Victim's disappearance, Tammy had control over Sidney's cell phone and actions, and together they sought to lure Victim to an unsafe and remote location by asking Victim to take the pregnancy test they had purchased at Walmart. The State contended the Moorers tried to destroy incriminating evidence by purchasing a new surveillance system and removing the one they had the night of the disappearance, deleting Sidney's Google GPS data and account, and removing the SD card from their Ford F-150's navigational system. The State also claimed the Moorers tried to avoid detection by using a payphone to call Victim and tried to avoid video evidence by not parking in the gas station parking lot by the payphone. The State noted Tammy returned Sidney's cell phone to his control for the first time in six weeks shortly after Victim disappeared.

As a final piece of incriminating evidence, the State offered testimony from Tammy's cousin Donald Demarino, who stated that after Victim's disappearance, Sidney showed him a picture of Victim on a mobile phone. Demarino explained the picture showed Victim was not "under her own free will," and based on the picture, he did not expect anyone to hear from Victim ever again. Demarino stated he did not tell anyone about the picture until he was imprisoned for an unrelated offense, but he stated he did not receive anything in exchange for telling the State about the picture. Demarino admitted, however, he told his mother that this story was not true. He explained he did this to stop his mother from worrying.

After the State rested, Sidney moved for a directed verdict, arguing the State had not

presented substantial circumstantial evidence to support the charges of kidnapping or conspiracy to kidnap. The trial court denied the motion.

During the defense's case, Sidney called Bruce Koenig as an expert witness in forensic analysis. Koenig testified there was no way to scientifically prove the vehicle in the surveillance videos was the Moorers' truck because the picture contained "nothing unique" and he saw more "differences than similarities" between the vehicle in the video and the Moorers' truck. However, Koenig agreed, based on Fredericks' work, the vehicle in the surveillance videos was likely a Ford F-150.

Tammy's sister, who lived next door to the Moorers, also testified for the defense, stating Tammy texted her when Tammy and Sidney came home at 3:10 a.m. on December 18, 2013; she then sent the Moorers' children home; and she saw the Moorers outside their door waiting for their children. Tammy's sister also testified she and her boyfriend gave Sidney his Christmas present, a car washing kit, on December 22, 2013, because the weather was nice and they wanted to wash their own car. She testified Sidney and Tammy also washed their car that day, and she noted the Moorers always burned trash. After the defense rested, Sidney renewed his motion for a directed verdict, which the trial court denied.

The jury found Sidney guilty of both kidnapping and conspiracy to kidnap. The trial court imposed concurrent sentences of thirty years' imprisonment for each charge. This appeal followed.

## II. STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only. This Court is bound by the trial court's factual findings unless they are clearly erroneous." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006) (internal citations omitted).

## III.   DISCUSSION
### 1.  Venue

After the 2016 mistrial, Sidney moved to change venue in his case from Horry County. The trial court granted this motion, changing the venue to Georgetown County because Sidney could not receive a fair and impartial trial in Horry County due to the massive pre-trial publicity and social media exposure. In particular, the trial court noted a number of possible jurors had posted on their social media that they "knew how to get around the Judge by just saying that [they] can be unbiased."

Three years later, in May 2019, the State requested the venue be returned to Horry County, noting since the 2016 order changing venue, two juries had been empaneled

for this case in Horry County (one in August 2017 for Sidney's charge of obstruction of justice related to the facts of this case and one in October 2018 for Tammy's trial on these charges); social media saturation had died down; and a fair and impartial jury could be empaneled in Horry County.  The trial court granted the State's venue motion and transferred venue back to Horry County.

Sidney argues the trial court erred in transferring venue back to Horry County because "social media saturation" regarding Victim's disappearance "pervaded" Horry County and jurors had shown "their ability and willingness to bypass impartiality determinations at trial."  Sidney also asserts the venue should have been changed because Victim's aunt was the Horry County Clerk of Court, and "her last name and familial status created the appearance of a conflict."  We disagree.

Sidney moved to transfer venue on the first day of his retrial.  The trial court noted that out of the 300 hundred members of the jury venire, 173 indicated they had no knowledge of the case on their juror questionnaires.  The trial court said these statistics confirmed its decision to change venue back to Horry County but ruled Sidney's motion would continue until a jury was empaneled.

During the ensuing *voir dire* process, several venire members noted they had heard about the case.  Almost all of these potential jurors were excused because they said they believed Sidney was guilty or they could not be impartial based on what they knew.  However, three that said they could be impartial despite what they had heard about the case were allowed to remain.  Two members of the venire who knew Victim's sister were allowed to remain because they stated they would be impartial.  One other member who knew Victim's sister was excused because of her relationship with Victim's sister.  One venire member who knew Sidney was excused; one who was close friends with a police officer who was a witness in the case was excused; one who had mutual friends with Victim was excused; one who knew Victim was excused; and one whose husband was friends with Victim was excused.  After *voir dire* was completed, the petit jury was selected, including three alternates.  None of the seated jurors or alternate jurors had stated they knew about the case or knew a witness in the case.  No motions were made by either party regarding the selection process.

After jury selection, Sidney brought up the motion he had filed to excuse the jury and continue trial based on the inherent conflict of interest in holding the case in Horry County where Victim's aunt was the clerk of court.  Sidney noted the clerk was Victim's aunt and the clerk acted as an "extension of the court."  The trial court denied this motion, noting while the clerk was "very much involved with this proceeding, as she should be, she's in charge of the courthouse," it had asked the

clerk to let her assistants be the ones in the courtroom handling the case. The trial court did note, however, that the clerk's name, Renee Elvis, was on the juror summons.

We find the trial court did not abuse its discretion in denying Sidney's motions to change venue back to Horry County. *See State v. Evins*, 373 S.C. 404, 412, 645 S.E.2d 904, 908 (2007) ("A motion to change venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion."). First, as to Sidney's argument regarding the pre-trial publicity and social media saturation of this case, the trial court carefully examined the jury pool as to their knowledge of the case and their ability to be impartial, excusing every juror who stated they could not be impartial based on their knowledge of the case or knowing a witness in the case. *Id.* ("When a trial judge bases the denial of a motion for a change of venue because of pretrial publicity upon an adequate *voir dire* examination of the jurors, his decision will not be disturbed absent extraordinary circumstances."); *id.* ("When jurors have been exposed to pretrial publicity, a denial of a change of venue is not error where the jurors are found to have the ability to set aside any impressions or opinions and render a verdict based on the evidence presented at trial."); *see also Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961) ("It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); *State v. Avery*, 374 S.C. 524, 531–33, 649 S.E.2d 102, 105–06 (Ct. App. 2007) (finding the trial court did not abuse its discretion in denying defendant's motion for a change of venue based on pretrial publicity because the trial court "individually examined these venirepersons; the court inquired as to each venireperson's (1) exposure to the case, (2) formation of opinions about the case, and (3) ability to set aside those opinions in order to determine with impartiality whether the defendant was guilty beyond a reasonable doubt," excusing the two venirepersons who had knowledge of the case, had formed an opinion in the case, and could not set their opinion aside and be impartial).

Additionally, Sidney cannot prove any actual prejudice from pretrial publicity because none of the members of the venire with knowledge of the case or who knew

any of the witnesses in the case were seated on the petit jury. *See Evins*, 373 S.C. at 413, 645 S.E.2d at 908 ("It is the defendant's burden to demonstrate actual juror prejudice as a result of such publicity."); *id.* at 412–13, 645 S.E.2d at 908 (finding defendant did not prove he suffered any prejudice from the denial of his motion to change venue based on pre-trial publicity even where seven of the twelve seated jurors "had some knowledge of the case" because (1) "the trial court and defense counsel conducted a thorough *voir dire* of the jury pool," (2) all of the jury pool members who had knowledge of defendant or his pending charge in another murder stated they could "put that knowledge aside," and (3) the defense did not use all of its peremptory challenges); *State v. Caldwell*, 300 S.C. 494, 502, 388 S.E.2d 816, 821–22 (1990) (finding trial court did not abuse its discretion in denying defendant's motion for a change of venue where "eleven of the seated jurors and two of the alternate jurors were aware of media coverage of the crime," because "those jurors expressed to the trial judge no doubt or reservation of their ability to impartially serve as a juror and to decide the matter solely on the evidence presented," and thus, the defendant did not prove prejudice or extraordinary circumstances warranting a change of venue), *overruled on other grounds by State v. Evans*, 371 S.C. 27, 30, 637 S.E.2d 313, 315 (2006); *State v. Stanko*, 402 S.C. 252, 277–79, 741 S.E.2d 708, 721–22 (2013) (finding the trial court did not abuse its discretion in denying defendant's motion to change venue where "seven of the twelve jurors seated had some knowledge of the case," but defendant did not prove prejudice or "present even one juror who stated he or she could not ignore exposure to pretrial publicity prior to serving as a juror"), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019).

Second, the trial court was well within its discretion to not change venue due to Victim's aunt being the Horry County Clerk of Court. Sidney did not demonstrate he was prejudiced by Victim's aunt's position as the clerk of court. Sidney did not allege Victim's aunt had acted improperly as the clerk of court in this case; he only challenged the appearance of impropriety.

The trial court acted prudently to prevent the appearance of any impropriety by asking Victim's aunt to let one of her assistant clerks handle the case, asking Victim's aunt to not be in the courtroom for the trial, and not mentioning the clerk's name to the jury. Victim's aunt was not present for the jury selection, she had no hand in the *voir dire* process or selecting the jury, and the only time her name was said or provided to the jury pool was on the jury summons. *But see State v. Sullivan*, 39 S.C. 400, 17 S.E. 865, 867–68 (1893) (finding the circuit court did not abuse its discretion in changing the venue of a trial from Greenville County when the defendant was charged with murdering the half-brother of the Greenville sheriff,

who "had acted as a member of the board of jury commissioners for that county, and by which board such panel of petit jurors had been selected, and also . . . had summoned, or caused to be summoned, every one of such petit jurors for attendance upon the court at that term"). Sidney failed to demonstrate that any of the jurors noted Victim's aunt's name on the juror summons or that they believed or knew that Victim and her aunt were related. Therefore, we find the trial court did not err in denying Sidney's motion to change venue.

## 2. Directed Verdict

Sidney argues the trial court erred in denying his motion for a directed verdict because there was no direct or substantial circumstantial evidence that he kidnapped or conspired with Tammy to kidnap Victim. We disagree.

While the State did not present any direct evidence of Sidney's guilt, it did present substantial circumstantial evidence. *See State v. Zeigler*, 364 S.C. 94, 103, 610 S.E.2d 859, 863 (Ct. App. 2005) ("The appellate court may reverse the trial judge's denial of a motion for a directed verdict only if there is no evidence to support the judge's ruling."); *State v. Curtis*, 356 S.C. 622, 633, 591 S.E.2d 600, 605 (2004) ("In reviewing a motion for directed verdict, the trial judge is concerned with the existence of the evidence, not with its weight."); *id*. at 633–34, 591 S.E.2d at 605 ("If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [c]ourt must find the case was properly submitted to the jury.").

The State presented evidence indicating Victim disappeared against her will. The State also presented evidence Sidney kidnapped Victim, including evidence indicating: (1) Sidney had motive to kidnap and harm Victim—to appease Tammy's anger about the affair and to avoid any negative consequences of Victim's possible pregnancy; (2) Sidney went to Walmart hours before Victim disappeared to purchase a pregnancy test when Victim was showing symptoms of pregnancy; (3) Tammy was in control of both her and Sidney's cell phones from November 2, 2013, when she discovered the affair, until the early morning hours of December 18, 2013, when Victim disappeared; (4) based on their cell phone location data, the Moorers' life pattern changed drastically after Tammy discovered the affair and this change showed the Moorers' phones were increasingly located in the same vicinity as each other; (5) Sidney admitted he spoke to Victim from a payphone and later from his own cell phone the morning she disappeared; (6) Victim spoke to Warrelmann about the phone call with Sidney, and Warrelman said she told Victim not to meet with Sidney, but Victim soon left her apartment and repeatedly called the payphone number and Sidney's number after this conversation with Warrelmann; (7) Victim

repeatedly called Sidney on the morning of her disappearance, including just moments before 3:41 a.m. when Victim's phone stopped reporting any data; (8) the Landing, an area that Victim's cell phone data showed she did not frequent, was only a short distance from the Moorers' home; (9) video surveillance from the morning of Victim's disappearance showed a black truck going to and from the area of the Landing around the time of Victim's disappearance; (10) Fredericks, an expert in forensic video analysis, opined the truck seen in the surveillance videos was the Moorers' black Ford F-150; (11) Sidney showed Demarino a picture of Victim after her disappearance depicting her restrained; and (12) Sidney acted to remove any possible incriminating evidence by removing the Moorers' old surveillance system and purchasing a new one; removing the SD card from the Moorers' Ford F-150's navigational system at 12:07 a.m. on December 18, 2013, three hours before Victim disappeared; deleting his Google GPS data; pressure washing and vacuuming the Moorers' Ford F-150 two days after Tammy would not consent to letting police officers look inside the truck; and burning the rags used to wash their truck.

Finally, as to Sidney's argument there were no signs of struggle at the Landing or in the Moorers' truck, we note evidence of a struggle is not required to prove a kidnapping occurred, and in cases of inveigling or decoying, there would not be signs of struggle because the victim is tricked into going with their kidnapper willingly. *See Stokes*, 345 S.C. at 373, 548 S.E.2d at 204 ("[T]he fact that [a victim] was 'inveigled' or 'decoyed' into going [somewhere with the defendant] negates, in legal contemplation, the voluntariness of her participation." (internal footnotes omitted)); *State v. East*, 353 S.C. 634, 637, 578 S.E.2d 748, 750 (Ct. App. 2003) ("South Carolina's kidnapping statute requires proof of an unlawful act taking *one* of several alternative forms, including . . . inveiglement[ or] decoy . . . ." (emphasis added)). The State alleged the Moorers lured Victim to the Landing by having Sidney contact Victim and asking her to meet for the purpose of taking a pregnancy test to determine if she was pregnant with Sidney's child. Thus, the State did not have to prove the Moorers kidnapped Victim by force or prove there was a struggle. *See Ray v. State*, 330 S.C. 184, 188, 498 S.E.2d 640, 642 (1998) (kidnapping was proven when evidence showed the defendant inveigled victim into his truck under the pretense he was taking her to the hospital); *see also United States v. Hughes*, 716 F.2d 234, 239 (4th Cir. 1983) ("nothing in the policy of the . . . kidnapping statute justifies rewarding the kidnapper simply because he is ingenious enough to conceal his true motive from his victim until he is able to transport her . . . [to another location]."). Accordingly, because the State presented substantial circumstantial evidence Sidney kidnapped Victim, we affirm the trial court's denial of Sidney's directed verdict motion as to the kidnapping charge.

The State also presented sufficient evidence that Sidney and Tammy conspired to kidnap Victim. Tammy's and Sidney's iPhones' locations demonstrated they tracked Victim's whereabouts following Tammy's discovery of the affair. This and other evidence illustrated vividly that Sidney and Tammy were operating in tandem, focusing their joint attention on Victim before she vanished. Tammy controlled Sidney's iPhone from November 2, 2013, until the very hour of Victim's disappearance, when Sidney began using it again. Sidney admitted that he and Tammy were together in their Ford F-150 in the early morning hours of December 18, 2013, including at the payphone where Sidney called Victim on the night of Victim's disappearance and when the SD card was removed from the Moorers' truck's navigational system. Tammy also helped Sidney clean the Moorers' Ford F-150 truck and would not consent to allowing police officers into the truck. Accordingly, we affirm the trial court's denial of Sidney's directed verdict motion as to the conspiracy to kidnap charge.

Conspiracy often can only be proven by circumstantial means, as the crime often lurks in dark caverns, far from the light of day. We conclude there was evidence of a common design and mutual tacit agreement between Tammy and Sidney that went well beyond mere association or suspicion. *See State v. Fleming*, 243 S.C. 265, 274, 133 S.E.2d 800, 805 (1963). Given the timelines and conduct the evidence bore out, the Moorers' truck's path to the Landing was a fateful link in their long-laid plans, plans that required Sidney and Tammy's mutual cooperation. *State v. Jeffcoat*, 279 S.C. 167, 170, 303 S.E.2d 855, 857 (1983).

### 3. Expert Testimony

Sidney argues the trial court erred in qualifying Fredericks as an expert in forensic video analysis and allowing him to testify as to his conclusion that the Moorers' truck was the one in the surveillance videos to the exclusion of "all other vehicles based on headlight pattern" because the conclusion was refuted by Koenig and was unreliable.

This issue is unpreserved for our review. At no time during the pre-trial hearing on the admissibility of Frederick's testimony or the trial did Sidney object to Frederick's qualifications as an expert in forensic video analysis. Instead, at the pre-trial hearing and at trial, Sidney made it clear that he did not object to Frederick's qualifications as an expert or his ability to conclude that the vehicle in the surveillance videos was a Ford F-150. Sidney's only objections at the pre-trial hearing and at trial pertained to whether Fredericks could conclude that the vehicle seen in the surveillance videos was the Moorers' Ford F-150 to the exclusion of all others based on headlight spread

pattern analysis. Specifically, at trial, Sidney objected to (1) Frederick's ability to conclude the vehicle seen in the surveillance videos was the Moorers' truck as being outside the scope of Fredericks' expertise and (2) Fredericks' stating his opinion before testifying as to his methodology and how he reached his determination. The trial court sustained both objections. As to the first objection, the trial court explained at this point, the State could only ask Fredericks if he made a determination, not if he made a "match." As to the second objection, the trial court stated Fredericks had to explain whether his opinion resulted from the reliable application of his methodology before giving his opinion. After explaining the method and how he made his determination in depth, Fredericks opined the Moorers' truck was the suspect vehicle in the surveillance videos. Sidney made no further objections when Fredericks discussed his methodology or when Fredericks testified as to his opinion that the vehicle seen in the surveillance videos was the Moorers' truck. Therefore, we find Sidney did not make a timely objection to this conclusion and did not ask the trial court to rule on the specific issues of whether Fredericks' conclusion was outside of the scope of his expertise or was unreliable even after Fredericks extensively testified as to his methodology. *State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011) ("For an objection to be preserved for appellate review, the objection must be made at the time the evidence is presented and with sufficient specificity to inform the circuit court judge of the point being urged by the objector." (internal citations omitted)); *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."). Therefore, based on preservation, we affirm the admission of Fredericks' expert opinion testimony.

## IV. CONCLUSION

Accordingly, we affirm (1) the trial court's denial of the motion to change venue, (2) the trial court's denial of Sidney's motion for a directed verdict as to his kidnapping and conspiracy to kidnap charges, and (3) the admission of Fredericks' expert opinion testimony.

**AFFIRMED.**

**GEATHERS, J., and LOCKEMY, A.J., concur.**